**KRONENBERGER ROSENFELD, LLP**

Karl S. Kronenberger (Bar No. 226112)
Jeffrey M. Rosenfeld (Bar No. 222187)
Virginia A. Sanderson (Bar No. 240241)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@KRInternetLaw.com
jeff@KRInternetLaw.com
ginny@KRInternetLaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**VERDE MEDIA CORP.** f/k/a The Verde Media Group, LLC, a Nevada corporation,

        Plaintiff,

        v.

**RON LEVI**, an individual; **ARDESHIR S. AKHAVAN**, an individual; **HARKLET ENTERPRISES, LTD.**, a Cyprus limited company; **NUNATON COMPANY, LTD.**, a Cyprus limited company; **INTERNET LIVE, LLC**, a California limited liability company; **NAUTELL CAPITAL LTD.**, a Cyprus limited company; **ALACRE TRADING LTD.**, a Cyprus limited company; and **DOES 1-20**,

        Defendants.

Case No. 4:14-cv-00891-YGR

**SECOND AMENDED COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520, San Francisco, CA 94108

1    Plaintiff Verde Media Corp., a Nevada corporation ("Plaintiff"), by and through its

2    undersigned counsel, states and alleges as follows:

3                                    **NATURE OF THE ACTION**

4            1.     This action alleges breach of contract, breach of the covenant of good faith

5    and fair dealing, unjust enrichment, fraudulent inducement, tortious interference with

6    business relationship, and violations of the federal Racketeer Influenced Corrupt

7    Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., on behalf of Plaintiff Verde Media

8    Corp. ("Plaintiff"), and against Ron Levi ("Levi"), Ardeshir S. Akhavan ("Akhavan"), Harklet

9    Enterprises Ltd. ("Harklet"), Nunaton Company Ltd. ("Nunaton"), Internet Live, LLC ("IL"),

10   Nautell Capital Ltd. ("Nautell"), Cash Traffic Ltd. ("Cash Traffic"), and Alacre Trading Ltd.

11   ("Alacre"), together with certain named and as yet unnamed employees, directors, agents,

12   co-conspirators, and aiders and abettors (collectively, "Defendants").

13           2.     Plaintiff alleges that Levi and Akhavan (collectively, the "Individual

14   Defendants"), own and operate a complex collection of domestic, foreign, and

15   international corporate entities, including without limitation Harklet, Nunaton, IL, Nautell,

16   Cash Traffic, and Alacre (collectively, the "Corporate Defendants"), with the express intent

17   of obfuscating the corporate structure thereof and evading liability to consumers,

18   administrative and law enforcement agencies, and those with which they do business,

19   such as Plaintiff.  Plaintiff further alleges that, under the umbrella of this corporate web,

20   Defendants engaged in a pattern of deceptive practices, including fraud, to mislead

21   Plaintiff into brokering key relationships for Defendants, resulting in tens of millions of

22   dollars of Internet traffic being driven to Defendants' adult and dating websites, and

23   millions of dollars in damages to Plaintiff when Defendants first avoided, and later flatly

24   refused, payment of the broker commissions owed to Plaintiff.

25           3.     This action seeks damages, including treble and punitive damages, redress

26   of injuries, attorneys' fees and costs, and other relief, all arising out of Defendants' breach

27   of contract, breach of the covenant of good faith and fair dealing, unjust enrichment,

28   fraudulent inducement, tortious interference with Plaintiff's business relationships, false

advertising, and violations of RICO.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction of Plaintiff's RICO claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) (civil remedies for RICO violations).

5. This Court has supplemental jurisdiction of Plaintiff's claims brought under the laws of the State of California pursuant to 28 U.S.C. § 1367(a) in that Plaintiff's state law claims are so related to the RICO claim raised in this Complaint that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper under 28 U.S.C. § 1391 because many of the incidents, events, or omissions complained of and giving rise to the instant claims and controversy occurred within the State of California and the parties, and each of them, have agreed through counsel that this Court is a proper Venue.

7. This Court has personal jurisdiction over Defendant Levi because, on information and belief, he is a resident of the State of California.

8. This Court has personal jurisdiction over Defendant Akhavan because, on information and belief, he is a resident of the State of California.

9. This Court has personal jurisdiction over Defendant Harklet because, on information and belief, its principal place of business is located in Calabasas, California.

10. This Court has personal jurisdiction over Defendant Nunaton because, on information and belief, its principal place of business is located in Calabasas, California.

11. This Court has personal jurisdiction over Defendant IL because it is a California limited liability company with its principal place of business located in Calabasas, California.

12. This Court has personal jurisdiction over Defendant Nautell because, on information and belief, its principal place of business is located in Calabasas, California.

13. This Court has personal jurisdiction over Defendant Cash Traffic because, on information and belief, its principal place of business is located in Calabasas, California.

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

14.     This Court has personal jurisdiction over Defendant Alacre because, on information and belief, its principal place of business is located in Calabasas, California.

## INTRADISTRICT ASSIGNMENT

15.     By agreement of the parties, this action should be assigned to the San Francisco Division or the Oakland Division.

## PARTIES

16.     Plaintiff Verde Media Corp. is a Nevada corporation with its principal place of business located in Clearwater Beach, Florida.  Plaintiff was formerly known as The Verde Media Group, LLC, a California limited liability company formed on August 10, 2011.  On or about January 10, 2014, Verde Media Corp. was formed and assumed all of the rights and obligations of its predecessor-in-interest, The Verde Media Group, LLC, including all rights to enforce the Agreement as alleged herein.

17.     On information and belief, Defendant Ron Levi is an individual residing in Calabasas, California.

18.     On information and belief, Defendant Ardeshir S. Akhavan is an individual residing in Agoura Hills, California.

19.     On information and belief, Defendant Harklet Enterprises Ltd. is a limited corporation formed under the laws of Cyprus and doing business within California as "CE Cash" and "CECash.com".   On information and belief, the Cyprus address listed on Harklet's website, <cecash.com> is a non-existent address used by Defendants for the purpose of registering Harklet as a business in Cyprus.  On  January 30, 2015, and after months of service attempts, Plaintiff's process server in Cyprus returned the certificate of service of the prior summons and complaint, stating that the documents could not be served because Harklet's listed address "could not be found."  On information and belief, Harklet's business operations take place at 5146 Douglas Fir Road, Calabasas, California.

20.     On information and belief, Defendant Nunaton Company Ltd. is a limited corporation formed under the laws of Cyprus and doing business within California as

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

"Cash Traffic" and "CashTraffic.com." On information and belief, the Cyprus address listed on Nunaton's website, <cashtraffic.com> is a physical address never occupied by Nunaton and used by Defendants for the purpose of registering Nunaton as a business in Cyprus. On January 30, 2105, and after months of service attempts, Plaintiff's process server in Cyprus returned the certificate of service of the prior summons and complaint, stating that the documents could not be served because Nunaton was "unknown at the given address." On information and belief, Nunaton's business operations take place at 5146 Douglas Fir Road, Calabasas, California.

21.    Based on Defendants' statements in documents filed with the Court in this case, Defendant Internet Live, LLC is a limited liability company formed under the laws of the State of California and doing business within California as "Internet Business Services" and "IBS." The address of IL's principal place of business, as listed with the Secretary of State, is 5146 Douglas Fir Road, Calabasas, California.

22.    On information and belief, Defendant Nautell Capital, Ltd. is a limited corporation formed under the laws of Cyprus and doing business within California as "CitySex" and "CitySex.com." On information and belief, Nautell's Cyprus address is used for registration and mail-forwarding purposes only, and the vast majority of Nautell's business operations take place at 5146 Douglas Fir Road, Calabasas, California. As of the date of this Second Amended Complaint, Plaintiff's process server has not been able to serve the prior summons and complaint on Nautell at its Cyprus address, but is still attempting to do so.

23.    On information and belief, Defendant Alacre Trading Ltd. is a limited corporation formed under the laws of Cyprus and doing business within California as "iBallers" and "iBallers.com." On information and belief, Alacre's Cyprus address is used for registration and mail-forwarding purposes only, and Alacre's business operations take place at 5146 Douglas Fir Road, Calabasas, California. As of the date of this Second Amended Complaint, Plaintiff's process server has not been able to serve the prior summons and complaint on Nautell at its Cyprus address, but is still attempting to do so.

24.     On information and belief, and at all relevant times, Defendants Levi and Akhavan have been employees, officers, directors, agents and/or representatives of the Corporate Defendants and conspired to commit the wrongful acts alleged herein and are jointly and/or severally liable for the wrongful acts alleged herein.

25.     Defendants DOES 1-20 (the "Doe Defendants") are as yet to be identified officers, employees, agents, co-conspirators, and/or aiders and abettors of Defendants. Upon further discovery, and when the relevant information has been obtained, Plaintiff will seek to amend this Complaint to state the true names and capacities of the Doe Defendants.

26.     At all relevant times, each of the Defendants were acting as the agents, servants, and employees of their co-Defendants, and each of them, in doing the things hereinafter alleged, were acting in the scope of their authority as agents, servants, and employees and with the permission, consent, authorization and ratification of their co-Defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Plaintiff and Plaintiff's Business

27.     Plaintiff is a broker of Internet traffic specializing in the adult paysite, adult webcam (referred to within the industry as "cam"), and adult dating industries.

28.     As an Internet traffic broker, Plaintiff has expended substantial time and resources developing key relationships with a roster of website and blog owners—known in the industry as "publishers" or "affiliates."  Plaintiff has also developed key relationships with so-called "ad networks" or "affiliate networks," which are companies that aggregate hundreds or even thousands of publishers, thereby substantially reducing the number of persons and entities that the advertiser client has to personally manage.

29.     The directed flow of consumers from publisher to advertiser is commonly referred to within the business as Internet "traffic" or "leads," dependent on the type of action or information ultimately sought from the consumer.

30.     The adult paysite, adult cam, and adult dating industries are highly

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1  specialized, and only a handful of brokers have developed as many key contacts as
2  Plaintiff has with its roster of publishers and networks who have demonstrated
3  measurable success in driving Internet traffic within this industry.

4      31.    Plaintiff's clients are the owners and operators of adult-themed websites and
5  adult dating websites, and are referred to within the industry as "advertisers."

6      32.    Plaintiff provides its brokerage services by referring key publishers or
7  networks to advertisers.

8      33.    Like brokers in a variety of industries, Plaintiff is compensated for its
9  services through payment of a broker or referral fee. Plaintiff's advertiser clients generally
10 pay Plaintiff a commission between five dollars ($5) and ten dollars ($10) for each sale or
11 other financial transaction completed by a consumer with the advertiser as a result of the
12 referral.

13     34.    To better illustrate the flow of relationships and money for a single
14 transaction, Plaintiff refers a network to an advertiser, and the network in turn refers a
15 customers to the advertiser. When the customer completes a purchase on the
16 advertiser's website, the advertiser pays an agreed-upon commission directly to the
17 network and separately pays Plaintiff a $10 broker fee.

18     35.    Adult paysite, adult cam, and adult dating websites can be extremely
19 lucrative if the websites are advertised to the right consumers. A single referral from
20 Plaintiff can result in tens of millions of dollars in traffic to a particular advertiser, in which
21 case, Plaintiff is owed and paid millions of dollars in broker fees over the life of the referral
22 relationship.

23                          **Defendants and Defendants' Businesses**

24     36.    Defendants own and operate several lucrative adult paysites, adult cam,
25 and adult dating websites.

26     37.    In relevant part, the Individual Defendants and Harklet own and operate the
27 website located at <cecash.com>[1] (the "CECash Website"). The CECash Website serves

28
___
[1] As a courtesy to the Court, Plaintiff warns that most, if not all, of the websites referenced herein

as a portal for publishers and networks driving traffic to other websites owned and operated by Defendants.  The homepage of the CECash Website states:

> Over 50 New sites to promote!  New marketing tools!  New User Friendly Stats Interface!  The all new Cecash [sic] 3.0 is all about making YOU more money!  For 11 years, we have strived to create innovative sites and products to diversify your income and make your traffic convert.  After 11 years, 2 billion surfers, 6.9 million members, and over $105,000,000 dollars in webmaster payouts, we are happy to present you with the all new CECash 3.0!

38.    On the "Adult Webmaster Affiliate Program Terms and Conditions" page of the CECash Website, the terms identify the owner of the website as "Harklet Enterprises, Limited., doing business as, CECash.com [all sic]."

39.    The website for the Department of Registrar of Companies and Official Receiver for the Republic of Cyprus, located at <www.mcit.gov.cy> (the "Cypriot Business Registry"), lists the following as the registered office for Harklet:    Διαγόρου, 11,Λατσιά2235, Λευκωσία, Κύπρος (Diagorou, 11 Latsia 2235, Nicosia, Cyprus). However, when Plaintiff's process server attempted to serve the prior summons and complaint on Harklet, it said that such address "could not be found."  A search for the address on Google Maps also demonstrates that it cannot be found.

40.    Plaintiff is also informed and believes that the Individual Defendants and Nunaton own and operate the website located at <cashtraffic.com> (the "Cash Traffic Website").  Like the CECash Website, the Cash Traffic Website also serves as a portal for publishers and networks driving traffic to other websites owned and operated by Defendants.

41.    On the "Adult Webmaster Affiliate Program – Terms and Conditions" page of the Cash Traffic Website, the terms identify "Nunaton Company Ltd, doing business as, CashTraffic.com [all sic]" as the owner of the Cash Traffic Website.

42.    The Cypriot Business Registry lists the following as the registered office for Nunaton: Αχαιών, 25, Flat 401, 1101, Λευκωσία, Κύπρος (Achaeans, 25, Flat 401, 1101,

_____

contain graphic adult content.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1  Nicosia, Cyprus).  However, when Plaintiff's process server attempted to serve the prior

2  summons and complaint on Nunaton, it said that Nunaton was not known at such

3  address.

4       43.    Plaintiff is also informed and believes that the Individual Defendants and

5  Alacre own and operate the website located at <iballers.com> (the "iBallers Website").

6  The iBallers Website also serves as a portal for publishers and networks driving traffic to

7  other websites owned and operated by Defendants.

8       44.    The "Terms and Conditions" page of the iBallers Website expressly states

9  that the user is "entering into a binding an enforceable contract with www.iballers.com

10  operated by Alacre Trading Limited – Agiou Eleftheriou 74A 1st Floor, Strovolos, Nicosia,

11  Cyprus ('Company'; 'We')."

12       45.    Plaintiff is also informed and believes that the Individual Defendants and

13  Nautell own and operate the website located at <citysex.com> (the "City Sex Website").

14  The City Sex Website is an adult dating website.

15       46.    On the "CitySex Terms of Use Agreement" page of the City Sex Website,

16  the terms identify Nautell Capital Limited as the "operator" of the Website.  They further

17  provide the following address for Nautell's copyright agent:   Nautell Capital Limited,

18  Stasinou, 1 MITSI BUILDING 1, 1st floor, Flat/Office, Plateia Eleftherias, Nicosia, Cyprus

19  1060."

20       47.    On information and belief, IL is the entity used by Defendants to lease

21  Defendants' office space located at 5146 Douglas Fir Road, Calabasas, California, and to

22  hire many of the employees working as the agents of and for the benefit of all Defendants.

23       48.    The websites and business entities referenced above in Paragraphs 36

24  through 47 are just a small portion of the websites and corporations owned, operated,

25  and/or affiliated with Defendants.   Indeed, Plaintiff is informed and believes that

26  Defendants own and operate over 50 publisher, portal, adult entertainment, and dating

27  websites through numerous entities; however, Plaintiff has referenced only those that, as

28  of the date of this complaint, Plaintiff knows have a direct relationship to, and are the

1  proximate cause of, Plaintiff's harm.

2      49.    Plaintiff is informed and believes that the Individual Defendants have formed

3  and operate numerous corporate entities, both in the United States and abroad, as a

4  means of fraudulently concealing from Defendants' consumers, business partners, and

5  others that the Individual Defendants are responsible, and therefore liable, for the content

6  and business practices on and/or related to Defendants' websites.

7      50.    Plaintiff is informed and believes that, at all relevant times, Levi has provided

8  the financial backing for, and derived the principal financial benefit from, the numerous

9  corporate entities that are related to Defendants and their websites.  Indeed, over 35 U.S.

10 corporations and limited liability companies, including ones formed in California and

11 Nevada, have listed Levi as an owner or principal during their corporate lifetime, which is

12 often very short.

13     51.    In addition to these U.S. corporate entities, Plaintiff is informed and believes

14 that Levi has registered, or caused to be registered, numerous companies abroad,

15 including in the United Kingdom and Cyprus, as referenced in this Complaint.  Plaintiff is

16 informed and believes that Levi registered companies in international jurisdictions with the

17 specific intent of further concealing the true ownership of the Corporate Defendants and

18 Defendants' websites and thereby evading liability for Defendants' deceptive business

19 practices and other misconduct.

20     52.    Plaintiff is informed and believes that Akhavan oversees the day-to-day

21 operations for Defendants' business and, as such, has substantial decision-making

22 authority, including with respect to staffing, advertising agreements, and payments to

23 third-party affiliates and brokers.   Akhavan works closely with Levi in this regard.

24          **Alter Ego Allegations Regarding the Corporate Defendants**

25     53.    Plaintiff is informed and believes, and thereupon alleges that, at all relevant

26 times, the Corporate Defendants, and each of them, were the alter egos of the other

27 Corporate Defendants.

28     54.    The corporate entities owned and operated by the Individual Defendants are

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA  94108

so numerous that Individual Defendants have failed to segregate the operation and finances of each Corporate Defendant from the other Corporate Defendants or other corporate entities not named herein. Instead, the Individual Defendants have treated the Corporate Defendants, *en masse*, as a single business and have referred to said business by the fictitious business names "CE Cash," "Internet Business Services," and "IBS." At all times relevant, the Individual defendants have maintained ultimate decision-making authority and control over the Corporate Defendants (with Akhavan covering day-to-day operations and Levi the corporate structure and financial decisions), and have personally served as the guiding force of the wrongful conduct alleged herein.

55. At all times relevant, the Individual Defendants failed to segregate the funds and property of each Corporate Defendant from the other Corporate Defendants and related business entities, and consistently commingled the funds and property of the Corporate Defendants. For example, as alleged in more detail below, although Akhavan represented to Plaintiff that Akhavan worked for "CE Cash"—technically, the fictitious business name for Harklet—the initial funds wired by Defendants to Plaintiff were from "Cash Traffic"—technically, the fictitious business name for Nunaton. As another example, Plaintiff is informed and believes that each of the Corporate Defendants is doing business out of the Douglas Fir address in Calabasas, and that the employees and contractors at that location are hired and paid by a single business entity but routinely perform work for all business entities owned and operated by the Individual Defendants, including the Corporate Defendants.

56. There existed and now exists a unity of interest and ownership between each of the Corporate Defendants and the other Corporate Defendants and the individuality and separateness of the Corporate Defendants have ceased for all intents and purposes.

57. At all times since their incorporation, each of the Corporate Defendants has been and now is a mere shell and naked framework which the Individual Defendants used as a conduit for the conduct of the business, property, finances, and affairs of all their

business entities, including the conduct and otherwise wrongful enterprises alleged herein. On information and belief, the Individual Defendants have not maintained adequate records to effectuate important transactions between the Corporate Defendants or otherwise maintained the requisite corporate formalities to the point that the Individual Defendants have a difficult time keeping track of the distinct identities and legal existence of all their business entities. For example, in this very action Defendants originally filed a motion to dismiss the original complaint and executed other documents in this action on behalf of an entity named "Internet Business Services," but have since admitted that "Internet Business Services" is a fictitious business name for one of the Corporate Defendants.

58. Each of the Corporate Defendants was created and continued by the Individual Defendants pursuant to a fraudulent plan, scheme and device conceived and operated by the Individual Defendants to avoid liability and for the purpose of substituting financially irresponsible corporations in the place and stead of the Individual Defendants and/or a bona fide business entity. Accordingly, each Corporate Defendant was formed with capitalization totally inadequate for the business in which said entity was and is engaged.

59. By virtue of the foregoing, adherence to the fiction of the separate corporate existence of each of the Corporate Defendants would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize upon any judgment in its favor.

### Defendants' Fraudulent Misrepresentations and Concealment

60. As a matter of practice, Defendants misrepresent to their business partners and potential business partners that the Corporate Defendants (and the other business entities owned and operated by the Individual Defendants) are a single business entity known as "CE Cash" when the truth is that the Individual Defendants own and operate dozens of U.S. and internationally-based business entities to conduct the business of "CE Cash."

61.    For example, in or around April 2010, Plaintiff's principal, Jeremy Greene ("Greene"), as part of work performed for his then-employer, met in person with Akhavan and Levi to discuss a potential partnership between "CE Cash" and the former employer. Throughout these negotiations, Akhavan and Levi held themselves out as the agents and owners of "CE Cash."

62.    By late 2012, Greene had formed his own company, Plaintiff Verde, which was engaged in the business of being an Internet Traffic Broker specializing in adult websites.    At that time, Greene, as Plaintiff's representative, was reintroduced to Akhavan, Levi and "CE Cash."

63.    Akhavan, holding himself out and acting as the agent and representative of "CE Cash," made several intentional misrepresentations to Plaintiff in an effort to induce Plaintiff to provide brokerage services for Defendants and thereby increase Internet traffic to Defendants' adult websites.    These misrepresentations and concealments include the following:

64.    In a November 6, 2012 online instant message ("IM") exchange, Akhavan, acting as the agent and representative of Defendants, and each of them, repeatedly represented to Greene, as Plaintiff's representative, that the Corporate Defendants were a single business entity doing business as "CE Cash," and concealed the fact that the dating websites at issue were owned by multiple Cyprus corporations.    For example, as part of the November 6, 2012 IM exchange:

   a. Akhavan communicated using the IM username "CERD"—meaning "CE Ardy," representing that Akhavan worked for "CE Cash";

   b. Akhavan stated that "scott runs the dating department… and adam and fabian are also part of that team," indicating that Defendants' business was a single entity with a single "dating department," even though Defendants' adult dating websites are technically owned by numerous different corporations;

   c. Akhavan stated that "we work withe veryone [sic] in the biz, no reason we

aren't working together," even though the Defendants' business is spread across numerous business entities, making it unlikely that any single entity works with "everyone" in the biz, regardless of colloquial meaning;

    d. Akhavan provided the email address <ardy@cestaff.com> as his contact information.

65. At no point during the November 6, 2012 IM exchange did Akhavan identify Corporate Defendants IL, Harklet, Nunaton, Nautell, or Alacre. Similarly, at no point during the November 6, 2012 IM exchange did Akhavan explain that "CE Cash" was a non-existent entity, a fictitious business name, or was used informally to describe a collection of U.S. and internationally-based business entities.

66. During the November 6, 2012 IM exchange, Akhavan, acting as the agent and representative of Defendants, also made several misrepresentations indicating that Defendants would pay Plaintiff an upfront fee to get started in addition to a $10 per transaction broker fee for enlisting advertising networks with Defendants' affiliate programs and getting them up and running, while concealing the fact that Defendants had no intent of paying Plaintiff. For example, as part of the November 6, 2012 IM exchange:

    a. Akhavan stated, "but basically i need marketing people, but also good ole fashioned sales people / brokers etc";

    b. Greene asked, "what do you guys offer for brokers? On all the deals I have done besides [name redacted], I got a small fee for the first 3 months so I could put a tone of time into it and be paid til the accounts started making money. Is that something you guys would be ok with…," to which Akhavan responded, "honestly dude, I don't even think that short term lol…..lets just make it happen . . . . you tell me what you need to make a successful attempt / and we can give it a go";

    c. Akhavan stated "you can start whever [sic] buddy / just shoot me an invoice for your service fees / I'll get that paid for ya and we can begin";

    d. Greene asked "just so I know what to base the invoice off of, once volume is

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

up, what per sale will I get? I usually get like $10/sale," to which Akhavan responded "really depends man, we usually do 10% of payout / so I can do 10$."

67. At no point during the November 6, 2012 IM exchange did Akhavan state that Defendants would not pay Plaintiff or that, as a matter of practice, Defendants did not work with brokers. To the contrary, Akhavan expressly stated at the start of the exchange that Defendants were looking for brokers.

68. In a November 7, 2012 IM exchange, Akhavan, acting as the agent and representative of Defendants, and each of them, represented to Greene, as Plaintiff's representative, that Defendants would pay Greene the agreed-upon brokers fee even if the referred networks were existing publishers of Defendants if, at the time, said publisher were not doing substantial business for Defendants.

69. For example, in the November 7, 2012 IM exchange Greene explained that he could bring a list of his contacts to Defendants to "see who I can and cant touch," and Akhavan responded "sounds good dude / im sure we work with a lot of people already but any that we are not or not getting the max out of I would be done [sic] for you to rep, no problem."

70. At no point in the November 7, 2012 IM exchange did Akhavan inform Plaintiff that Defendants would not pay the agreed-upon fees for referrals of existing publishers.

71. At the time Akhavan, acting on behalf of all Defendants, made each of the foregoing misrepresentations, he knew the information contained therein to be false.

72. At the time Akhavan, acting on behalf of all Defendants, made each of the foregoing concealments, he knew the concealed information was material to Plaintiff's decision to enter into an agreement to provide broker services to Defendants.

73. Specifically, at all relevant times, Akhavan knew that he did not work for, and the Corporate Defendants did not constitute, a single entity called "CE Cash." Akhavan further knew that Defendants had no intention of paying Plaintiff the agreed-

KRONENBERGER ROSENFELD
150 Post Street, Suite 520, San Francisco, CA 94108

1  upon broker fees or giving Plaintiff credit for activating existent but dormant publishers.

2  74.   Each fraudulent IM transmitted to Plaintiff by Defendants via interstate wire

3  constituted an act of wire fraud.

**The Agreement Between Plaintiff and the Corporate Defendants**

**and the Corporate Defendants' Breach**

7  75.   On or about November 9, 2012, the Corporate Defendants, under the guise

8  of a single business entity doing business as "CE Cash," entered into an agreement with

9  Plaintiff for the referral of Internet traffic to Defendants' adult websites, including adult

10  paysites and adult dating websites (the "Agreement").

11  76.   Although Defendants concealed from Plaintiff the true identity of "CE Cash"

12  at the time the Agreement was formed, the facts at hand make it clear that the services

13  performed by Plaintiff were for the Corporate Defendants, and each of them, as they

14  addressed specific websites owned by the Corporate Defendants, including the iBallers

15  Website, the CE Cash Website, the City Sex Website, and the Cash Traffic Website.

16  77.   The terms of the Agreement were negotiated and documented in the

17  November 6, 2012 and November 7, 2012 IM exchanges between Akhavan, acting as the

18  agent and representative of the Corporate Defendants, and Greene, acting as the agent

19  and representative of Plaintiff.

20  78.   The terms of the agreement were as follows:

21     a.  Plaintiff agreed to refer publishers and networks to the Corporate

22         Defendants (the "Referrals");

23     b.  The Corporate Defendants agreed to pay Plaintiff $5,000 upfront to get the

24         Referral publishers and networks up and running with respect to their

25         advertising for Defendants;

26     c.  The Corporate Defendants further agreed to pay Plaintiff $10 for each

27         financial transaction resulting from traffic driven to Defendants by the

28         Referrals; and

KRONENBERGER ROSENFELD
150 Post Street, Suite 520, San Francisco, CA 94108

d. Plaintiff and Defendants further expressly agreed that the Agreement, and Defendants' payment obligations, would extend to Referrals of new publishers and networks to the Corporate Defendants as well as publishers and networks that had previously enrolled with Defendants, but were not actively driving substantial traffic to the Corporate Defendants at the time of the Referral.

79. The agreement was made effective on November 8, 2012, upon the Corporate Defendants' transfer of the initial $5,000 payment to Plaintiff.

80. According to Plaintiff's bank statement, this wire transfer was made by "Cash Traffic." This was the first time Plaintiff had any notice that any entity, whether fictitious or not, other than "CE Cash" was part of and/or related to the party with which it had contracted for brokerage services.

81. Pursuant to the Agreement, Plaintiff made numerous Referrals to the Corporate Defendants. In making these Referrals, Plaintiff expended time and effort complying with the demands of the Corporate Defendants in registering the Referral publishers and networks with Defendants' websites, including the CECash Website, the Cash Traffic Website, the City Sex Website, and the iBallers Website. Plaintiff also assisted in setting up the Referral publishers and networks to send traffic to the Corporate Defendants' websites, to track said traffic, and to receive payment from the Corporate Defendants.

82. On information and belief, Plaintiff's Referrals have resulted in millions of dollars of consumer sign-ups and other financial transactions for the Corporate Defendants.

83. Yet despite the profitable nature of the Referrals, and the Corporate Defendants' benefit therefrom, the Corporate Defendants have failed and refused to pay Plaintiff for anything other than the initial $5,000 fee.

84. Indeed, in direct contradiction to his earlier statements in the IMs promising to pay Plaintiff for the Referrals, Akhavan, in a September 24, 2013 email to Greene,

stated "Go find a real job instead of being a little whiney broker, do something of value and perhaps you will earn value."

85.     Plaintiff is now informed and believes that the Corporate Defendants have formed and operate numerous corporate entities, both in the United States and abroad, as a means of fraudulently concealing from Defendants' consumers, business partners, and others—including Plaintiff—the true identities of those responsible, and therefore liable, for the content and business practices on and/or related to Defendants' websites.

86.     Plaintiff is informed and believes that Defendants' complex corporate structure, which includes entities of unknown origin and entities registered in international jurisdictions such as Cyprus, has caused Defendants to believe they are "judgment-proof." It is this belief that gave Defendants, including Akhavan, the brash confidence to openly renege on the Agreement to pay Plaintiff for the Referrals.

87.     Indeed, after months of service attempts, Plaintiff has been unable to effectuate service upon Harklet, Nunaton, Nautell, and Alacre in Cyprus.

88.     As a result of Defendants' misconduct, Plaintiff has been harmed and continues to be harmed.  Plaintiff estimates that, under the Agreement, the Corporate Defendants will owe Plaintiff over $5 million through the end of 2014, with the amount growing exponentially thereafter.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract
### Against the Corporate Defendants)

89.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 88.

90.     The Agreement is a valid and enforceable contract between Plaintiff, on the one hand, and the Corporate Defendants, on the other, and is supported by valuable consideration.

91.     Plaintiff has fulfilled all of its obligations under the Agreement.

92.     The Corporate Defendants have materially breached, and continue to

breach, the Agreement by failing to honor its terms, including by failing to pay Plaintiff amounts owed pursuant to the Agreement.

93.     As a direct and proximate result of the Corporate Defendants' material breaches of the Agreement, Plaintiff has been damaged in an amount exceeding $5 million and to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing

### Against the Corporate Defendants)

94.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 93.

95.     The Agreement is a valid and enforceable contract between Plaintiff, on the one hand, and the Corporate Defendants, on the other, and is supported by valuable consideration.

96.     Plaintiff has fulfilled all of its obligations under the Agreement.

97.     The Corporate Defendants have unfairly and intentionally interfered with Plaintiff's rights to receive the benefits of the Agreement, including by refusing to pay Plaintiff amounts owed pursuant to the Agreement.

98.     As a direct and proximate result of the Corporate Defendants' breach of the implied covenant of good faith and fair dealing appurtenant to the Agreement, Plaintiff has been damaged in an amount exceeding $5 million and to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment/Restitution

### Against All Defendants)

99.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 88.

100.     Plaintiff asserts this claim in the alternative to the First and Second Claims for Relief.

101.     Defendants have been enriched by their receipt of and benefit from the

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

time, effort, and connections of Plaintiff in making the Referrals to Defendants and setting up the Referral publishers and networks with Defendants' websites and tracking and payment platforms so that the Referral publishers and networks could drive traffic to Defendants' websites.

102.    Likewise, Plaintiff has been impoverished by the time and effort it has contributed to making the Referrals and getting the Referred publishers and networks up and running without receiving payment in return from Defendants.

103.    A causal relationship exists between Defendants' enrichment and Plaintiff's impoverishment in that Plaintiff's impoverishment is directly and proximately caused by Defendants' fraudulent conduct and wrongful and unjust refusal to pay Plaintiff for the benefits conferred on Defendants.

104.    Defendants have no reasonable justification for their failure to compensate Plaintiff for the enrichment they have received.

105.    Plaintiff lacks an adequate remedy provided by law and therefore seeks restitution for Defendants' unjust and unlawful conduct, in an amount exceeding $5 million to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### (Fraudulent Inducement
### Against All Defendants)

106.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 105.

107.    Beginning on or about November 6, 2012, and continuing through September 2013, Akhavan, as the representative and agent of Defendants, knowingly made false misrepresentations to Plaintiff in the process of negotiating the terms of the Agreement and convincing Plaintiff to provide additional Referrals under the Agreement. Specifically, as set forth in full detail above, Akhavan represented that:

      a. Defendants were a single company called "CECash";

      b. Defendants intended to pay Plaintiff a fee for all income earned by

Defendants as a result of the Referrals, pursuant to the Agreement; and

c. Defendants would compensate Plaintiff not only for Referrals of new publishers and networks, but also those publishers and networks that had previously enrolled with Defendants, but were not actively driving substantial traffic to Defendants at the time of the Referral.

108.    Defendants knew that the foregoing misrepresentations were false when made and that Defendants intended to pay Plaintiff no money other than the initial $5,000 fee.

109.    Defendants intended to induce reliance by Plaintiff on the misrepresentations. Specifically, Defendants intended to induce Plaintiff to enter into the Agreement and provide profitable Referrals and/or activate existing Referrals that Defendants, on their own, had been unable to activate.

110.    Plaintiff justifiably relied on Defendants' misrepresentations and, as a result of said reliance, entered into the Agreement and provided the Referrals, including by activating existing publishers and networks so that, within a very short period of time from Plaintiffs' involvement said publishers and networks were driving a huge and profitable amount of traffic to Defendants and their websites.

111.    Plaintiff did not discover the false nature of Defendants' misrepresentations or omissions until September 2013, when Akhavan, on behalf of Defendants, flatly refused to pay Plaintiff any amounts owed under the Agreement.

112.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has suffered damages of at least $5 million and according to proof at trial.

113.    Defendants' misrepresentations to Plaintiff, as set forth above, were made purposefully, with fraudulent intent, and without regard for the rights and interests of Plaintiff, thereby entitling Plaintiff to an award of exemplary and punitive damages as to Defendants in an amount sufficient to deter their wrongful conduct.

///

## SIXTH CLAIM FOR RELIEF

## (Violation of RICO, 18 U.S.C. §§ 1962(c), (d)

## Against All Defendants)

114. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 113.

115. This claim is brought under 18 U.S.C. § 1962(c), which is commonly known as the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

### The Persons

116. Plaintiff is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

117. Akhavan is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that he is an individual capable of holding a legal or beneficial interest in property.

118. Levi is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that he is an individual capable of holding a legal or beneficial interest in property.

119. Harklet is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

120. Nunaton is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

121. IL is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

122. Nautell is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

123. Alacre is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

124. Does 1 through 20, and each of them, are "person[s]" as that term is defined in 18 U.S.C. § 1961(3) in that each is a person or entity capable of holding a legal or beneficial interest in property.

### The Enterprise

125.    Akhavan, Levi, Harklet, Nunaton, IL, Nautell, Alacre, and Does 1 through 20, and each of them, have, through their association with one another, formed an enterprise separate and apart from themselves and separate from the improper conduct alleged herein (the "Enterprise").  The Enterprise is an association-in-fact enterprise, as that term is referenced in 18 U.S.C. § 1961(4), in that it is a union or group of individuals associated in fact although not a legal entity.

126.    The Enterprise is engaged in, and its activities affect, interstate commerce in that through the Enterprise, Defendants, and each of them, operate a nationwide adult paysite, adult cam, and adult dating website business that advertises to and enters into financial transactions with consumers across the fifty (50) states and internationally.

127.    Through the Enterprise, Defendants, and each of them, have associated together for a common purpose of engaging in a course of conduct.  The common purpose is to evade liability to consumers, administrative and law enforcement agencies, and those with which they do business, such as Plaintiff, through the use of a complex web of domestic and foreign corporations through which liability and cash flow are untraceable.

### The Pattern of Racketeering Activity

128.    Defendants, and each of them, conducted and participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

### Predicate Act: Wire Fraud

129.    Defendants engaged in racketeering activity by violating 18 U.S.C. § 1343, the wire fraud statute, by contacting Plaintiff numerous times via interstate instant message ("IM") and electronic mail and making false representations and concealments, including, as set forth in detail above, that:

a.  Defendants were a single company called "CECash";

b.  Defendants intended to pay Plaintiff a fee for all income earned by Defendants as a result of the Referrals, pursuant to the Agreement; and



150 Post Street, Suite 520, San Francisco, CA 94108

KRONENBERGER ROSENFELD

c. Defendants would compensate Plaintiff not only for Referrals of new publishers and networks, but also those publishers and networks that had previously enrolled with Defendants, but were not actively driving substantial traffic to Defendants at the time of the Referral. Defendants were a single company named "CECash," and Defendants intended to pay Plaintiff for the Referrals pursuant to the Agreement, in furtherance of Defendants' scheme to defraud Plaintiff into making the Referrals and thereby substantially increasing Defendants' profits.

130. Plaintiff justifiably relied on Defendants' misrepresentations and concealments via interstate IM and electronic mail as described above, to its detriment.

## The Resulting Damages to Plaintiff's Business and Property

131. Plaintiff has been directly and proximately injured in its business and property by Defendants' racketeering violations.

132. As a direct and proximate result of Defendants' multiple acts of wire fraud, Plaintiff has been deprived of millions of dollars of revenue owed to Plaintiff for the Referrals under the Agreement.

133. As a direct and proximate result of Defendants' general scheme and acts constituting financial institution fraud and money laundering, Plaintiff has been deprived of revenue that Plaintiff would have earned on the declined transactions had they been approved through Defendants' website as expected by the consumers who initiated them.

134. As a direct and proximate result of Defendants' acts of witness tampering, Plaintiff's business relationship, and associated economic advantage, with many of Plaintiff's key Networks, has been frustrated.

135. Defendants' acts were a substantial cause of the injuries of Plaintiff and these injuries were reasonably foreseeable.

136. Defendants had actual knowledge that their illegal acts were in violation of the law.



137. Under the provisions of 18 U.S.C. § 1964(c), Plaintiff is entitled to bring this action and to recover herein compensatory damages, treble damages, the costs of bringing this suit, and reasonable attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**

**(Conspiracy to Violate RICO**

**Against Akhavan and Levi)**

138. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 88 and 114 through 137.

139. This claim is brought by Plaintiff alleging a cause of action under 18 U.S.C. § 1962(d) for conspiring to violate 18 U.S.C. § 1962(c).

140. As alleged above in Plaintiff's Sixth Claim for Relief, Plaintiff, Defendants, and each of them is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that each is an individual or entity capable of holding a legal or beneficial interest in property.

141. As alleged above in Plaintiff's Sixth Claim for Relief, the Enterprise is an association-in-fact enterprise, as that term is referenced in 18 U.S.C. § 1961(4), in that it is a union or group of individuals associated in fact although not a legal entity.

142. As alleged above in Plaintiff's Sixth Claim for Relief, Defendants, and each of them, conducted and participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

143. In violation of 18 U.S.C. 1962(d), the Individual Defendants, and each of them, conspired to violate 18 U.S.C. § 1962(c) in that the Individual Defendants, and each of them, embraced and agreed to participate in the illegal objective of the Enterprise and the use of interstate wire communications, financial institution fraud, money laundering, and witness tampering to defraud and otherwise cause harm to Plaintiff.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:



KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1.     That the Court enter a judgment in favor of Plaintiff and against Defendants, and each of them, finding that Defendants, as applicable, have:

    a. Breached the Agreement,

    b. Breached the implied covenant of good faith and fair dealing,

    c. Unjustly enriched themselves at Plaintiff's expense,

    d. Fraudulently induced Plaintiff to enter into the Agreement,

    e. Tortiously interfered with Plaintiff's business relationships,

    f. Violated RICO, 18 U.S.C. § 1962(c),

    g. Conspired to violate RICO, in violation of 18 U.S.C. § 1962(d), and

    h. Violated 15 U.S.C. § 1125(a);

2.     That the Court award damages and monetary relief as follows:

    a. Damages of a compensatory and general nature, in an amount as alleged and demanded above and according to proof at trial,

    b. Treble damages pursuant to 18 U.S.C. § 1964(c),

    c. Punitive damages, where applicable,

    d. Costs of suit, and

    e. Reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 1117; and

3.     Such other relief that the Court determines is just and proper.

Respectfully Submitted,

DATED: February 18, 2015           **KRONENBERGER ROSENFELD, LLP**

By:   s/ Virginia Sanderson
            Virginia Sanderson

Attorneys for Plaintiff

## REQUEST FOR JURY TRIAL

Plaintiff hereby demands a trial of this action by jury.

DATED:  February 18, 2015                    **KRONENBERGER ROSENFELD, LLP**

By:    s/ Virginia Sanderson
                Virginia Sanderson

Attorneys for Plaintiff

