UNITED STATES DISTRICT COURT <span style="color:red">*ORIGINAL*</span>

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

VERDE MEDIA CORP., F/K/A     )
THE VERDE MEDIA GROUP, LLC   )
A NEVADA CORPORATION,        )
                             )
            PLAINTIFF,       )
                             )
  VS.                        )     NO. C 14-00891 YGR
                             )
RON LEVI, AN INDIVIDUAL,     )
ET AL.,                      )     PAGES 1 - 44
                             )
            DEFENDANTS.      )     OAKLAND, CALIFORNIA
_____)     TUESDAY, SEPTEMBER 23, 2014


## REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:            KRONENBERGER ROSENFELD, LLP
                         150 POST STREET, SUITE 520
                         SAN FRANCISCO, CALIFORNIA  94108-4707
                   BY:  VIRGINIA A. SANDERSON, ATTORNEY AT LAW


FOR DEFENDANTS           ROTHKEN LAW FIRM
                         3 HAMILTON LANDING, SUITE 280
                         NOVATO, CALIFORNIA  94949
                   BY:  IRA P. ROTHKEN, ATTORNEY AT LAW


REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1  TUESDAY, SEPTEMBER 23, 2014                    2:04 P.M.

2                   P R O C E E D I N G S

3         **THE CLERK:**  CALLING CIVIL ACTION 14-00891, VERDE

4  MEDIA VERSUS LEVI.

5     COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

6         **MS. SANDERSON:**  GOOD AFTERNOON, YOUR HONOR.  VIRGINIA

7  SANDERSON FOR THE PLAINTIFF VERDE MEDIA.

8         **MR. ROTHKEN:**  GOOD AFTERNOON, YOUR HONOR.  IRA

9  ROTHKEN FOR MR. LEVI AND THE MOVANTS.

10         **THE COURT:**  OKAY.  GOOD AFTERNOON.

11     WELL, IF YOU HAD BEEN IN THIS COURTROOM YESTERDAY, YOU

12  WOULD HAVE SEEN BOXES EVERYWHERE.  ALL OF THOSE BOOK CARTS

13  FULL OF BINDERS OF DOCUMENTS.  I'VE BEEN IN THE MIDST OF A

14  MULTI-WEEK PATENT TRIAL ON THE BUS ARCHITECTURE OF COMPUTER

15  CHIPS, AND THEY SETTLED BEFORE CLOSING ARGUMENTS.

16     SO YOU ARE GOING TO HAVE THE RARE OPPORTUNITY TO ARGUE

17  YOUR MOTION IN A DIFFERENT WAY.  I USUALLY COME ON TO THE

18  BENCH WITH A CLEAR PERSPECTIVE OF MY VIEWS AND A FEW

19  QUESTIONS.  AND IF I DON'T HAVE QUESTIONS, THEN YOU WOULD

20  USUALLY RECEIVE A NOTICE THAT I'M TAKING IT OFF CALENDAR SO I

21  USUALLY ONLY HAVE ARGUMENT IF I HAVE QUESTIONS.

22     BUT I MOVED YOUR CASE ONCE BEFORE, AND I DID NOT WANT TO

23  MOVE IT AGAIN.  SO I HAVE SPENT THE MORNING TRYING TO

24  UNDERSTAND WHAT IS GOING ON IN YOUR CASE AND WILL REALLY ALLOW

25  YOU TO -- TO WALK ME THROUGH IT IN A WAY THAT TYPICALLY

1  DOESN'T HAPPEN SO THAT WE CAN GET IT ON OUR DOCKET OF THINGS

2  THAT NEED TO BE RESOLVED.

3     I CAN TELL YOU THAT IN THE FIRST INSTANCE, IT WILL HAVE TO

4  BE REVISED IN SOME WAY, SHAPE, OR FORM.  I MEAN, IT IS NOT IN

5  A FORM THAT I AM SATISFIED WITH.  SEEN TOO MANY MOTIONS FOR

6  SUMMARY JUDGMENT AND TOO MANY COMPLAINTS THAT ARE NOT --

7  ARE -- DO NOT PROPERLY OR ADEQUATELY ARTICULATE THE BASIS FOR

8  WHAT THE LAWSUIT IS ABOUT.

9     AND IN THIS CASE, HAVING GONE THROUGH THE COMPLAINT, I

10  HAVE LOTS OF QUESTIONS NOT ONLY ABOUT THE FEASIBILITY OF SOME

11  OF THESE CAUSES OF ACTION, BUT IT DOES APPEAR TO ME THAT THE

12  PLAINTIFF HAS THROWN A LOT UP ON THE WALL AND HAS NOT OUTLINED

13  ITS THEORY WITH RESPECT TO ALL OF THESE INDIVIDUAL AND

14  CORPORATE DEFENDANTS.  AND THAT'S NOT ACCEPTABLE.

15     SO LET'S START WITH THE RICO CLAIM.  MY GENERAL SENSE OF

16  THIS COMPLAINT IS THAT SOME COMPANY -- IT'S NOT CLEAR TO ME

17  HOW BIG THIS COMPANY IS, BUT -- HAS BEEN A BROKER AND

18  ALLEGEDLY HAD SOME AGREEMENT WITH THE -- WITH AT LEAST ONE OF

19  THE DEFENDANTS TO -- TO SEND TO THE DEFENDANT OR DEFENDANTS

20  CLIENTS.  AND THE DEFENDANTS ARE NOT PAYING THEM, AND THE

21  PLAINTIFF AS THE BROKER IS UPSET ABOUT THAT, THEY AREN'T

22  GETTING PAID.  THAT'S THE NUCLEUS, IT SEEMS TO ME, OF THE

23  ARGUMENT.

24     SOUNDS IN CONTRACT, POTENTIALLY UNJUST ENRICHMENT, OR

25  COVENANT OF GOOD FAITH AND FAIR DEALING.  THAT, I UNDERSTAND.

1    BUT TO MOVE FROM THAT TO A RICO CLAIM IS A WHOLLY DIFFERENT

2    AND DISTINCT ATTEMPT.  SO IT IS UNCLEAR TO ME AS A THRESHOLD

3    MATTER HOW THIS PARTICULAR PLAINTIFF EVEN HAS STANDING TO

4    ALLEGE THE RICO CLAIMS THAT IT IS ATTEMPTING TO ALLEGE.  EVEN

5    IF WHAT YOU SAY IS TRUE IN THESE COMPLAINTS AND THESE ARE VERY

6    SIGNIFICANT CHARGES BEING MADE, THAT CONDUCT ISN'T DIRECTED

7    TOWARDS THIS PLAINTIFF.

8         **MS. SANDERSON:**  WE DISAGREE, YOUR HONOR.  AND I CAN

9    TAKE YOU THROUGH EACH OF THE PREDICATE ACTS AND EXPLAIN HOW IT

10   HAS BEEN DIRECTED AT PLAINTIFF AND PLAINTIFF HAS BEEN DAMAGED

11   IF YOU WOULD LIKE.

12        **THE COURT:**  WELL, I CAN READ THE COMPLAINT.  I'D LIKE

13   YOU TO ARGUE.

14        **MS. SANDERSON:**  VERY WELL.

15        **THE COURT:**  SO DON'T -- DON'T READ ME THE COMPLAINT.

16        **MS. SANDERSON:**  I WON'T.  I PROMISE, YOUR HONOR.

17      WE HAVE ALLEGED THE PREDICATE ACTS OF WIRE FRAUD,

18   FINANCIAL INSTITUTION FRAUD, MONEY LAUNDERING, AND WITNESS

19   TAMPERING.  WIRE FRAUD, THIS WAS DIRECTED TOWARDS THE

20   PLAINTIFF.  MISREPRESENTATIONS INTENTIONALLY MADE TO PLAINTIFF

21   THROUGH ELECTRONIC CHANNELS, INTERSTATE CHANNELS, INTENDED TO

22   INDUCE THE PLAINTIFF TO --

23        **THE COURT:**  BUT WHAT IS THE CONSPIRACY?  WHAT IS --

24   WHAT IS THE ACT?  WHAT IS THE FUNDAMENTAL RICO COMPLAINT?

25        **MS. SANDERSON:**  THE FUNDAMENTAL -- THE BASIS OF THE

1    RICO COMPLAINT IS THE ENTERPRISE HERE.  THE DEFENDANTS' USE OF

2    MULTIPLE CORPORATIONS, SOME -- IN SOME CASES IN INTERNATIONAL

3    JURISDICTIONS TO DISGUISE NOT ONLY FROM PLAINTIFF BUT FROM

4    FEDERAL AUTHORITIES WHICH THEY'VE HAD PROBLEMS WITH IN THE

5    PAST AND ALSO FROM THE CONSUMING PUBLIC THAT IT IS REALLY ONE

6    ENTITY, ONE GROUP OF PEOPLE WHO OWN ALL OF THESE VARIOUS WEB

7    PROPERTIES WHO ARE ENGAGED IN THIS VARIETY OF MISCONDUCT

8    ACROSS THE BOARD, INCLUDING CONDUCT DIRECTED AT THE PLAINTIFF.

9         **THE COURT:**  WHAT SPECIFICALLY WAS DIRECTED AT THIS

10    PLAINTIFF?

11         **MS. SANDERSON:**  WIRE FRAUD, MISREPRESENTATIONS MADE

12    DIRECTLY TO PLAINTIFF.

13         **THE COURT:**  "MISREPRESENTATIONS," WHAT DO YOU MEAN?

14    I MEAN, WE HAVE MISREPRESENTATION CASES ALL THE TIME.  THAT

15    DOESN'T GIVE YOU A RICO CAUSE OF ACTION.

16         **MS. SANDERSON:**  IT DOES WHEN IT'S COMBINED WITH THE

17    ENTERPRISE, WHEN THE CONDUCT -- THE CONDUCT AT --

18         **THE COURT:**  YOU'RE USING WORDS FROM THE STATUTE

19    WITHOUT EXPLAINING -- IT IS A CONCLUSORY WORD.  IT IS A

20    CONCLUSORY WORD.  YOU HAVE TO DESCRIBE IT.

21         **MS. SANDERSON:**  OUR DESCRIPTION IS THAT EACH OF THESE

22    DEFENDANTS ARE WORKING TOGETHER.  THEY'RE WORKING TOGETHER

23    WITH THE PURPOSE OF DEFRAUDING PLAINTIFF, OF DEFRAUDING THEIR

24    OTHER BUSINESS PARTNERS, OF DEFRAUDING FEDERAL AUTHORITIES --

25         **THE COURT:**  OKAY.  YOU DON'T REPRESENT FEDERAL

1    AUTHORITIES, CORRECT?

2            **MS. SANDERSON:**  CORRECT.

3            **THE COURT:**  YOU DON'T REPRESENT OTHER PEOPLE.  ALL

4    YOU REPRESENT IS THIS ONE COMPANY.

5            **MS. SANDERSON:**  CORRECT.

6            **THE COURT:**  SO WHAT DID THEY DO TO THIS ONE COMPANY

7    SPECIFICALLY?

8            **MS. SANDERSON:**  THEY REPRESENTED THAT THEY WERE ONE

9    COMPANY WHEN THEY ARE NOT.

10           **THE COURT:**  SO -- SO A COMPANY -- SO THIS GROUP OF

11   INDIVIDUALS TELLS YOU THAT THEY ARE NOT ACTING INDIVIDUALLY

12   BUT THEY ARE ONE COMPANY AND THAT'S -- AND -- AND THAT'S --

13           **MS. SANDERSON:**  AND --

14           **THE COURT:**  -- A RACKETEERING ACTIVITY?

15           **MS. SANDERSON:**  AND THAT WE ARE GOING TO PAY YOU FOR

16   REFERRING CLIENTS TO US.

17           **THE COURT:**  SO -- SO EVERY TIME THERE'S A BREACH OF

18   CONTRACT, THERE'S A RICO CLAIM?

19           **MS. SANDERSON:**  ABSOLUTELY NOT.  ABSOLUTELY NOT.  AND

20   THAT IS NOT OUR ARGUMENT.

21           **THE COURT:**  THEN WHAT IS THE ARGUMENT OF RACKETEERING

22   ACTIVITY SPECIFICALLY WITH RESPECT TO THIS SPECIFIC PLAINTIFF?

23           **MS. SANDERSON:**  WITH THIS SPECIFIC PLAINTIFF, HIS

24   INABILITY TO PROSECUTE, TO COLLECT ON THE CONTRACT, TO PURSUE

25   HIS BREACH OF CONTRACT CLAIM IS DUE TO THE RACKETEERING

1    ACTIVITY, AND THAT WAS THE PURPOSE OF THE RACKETEERING

2    ACTIVITY WITH RESPECT TO PLAINTIFF.

3           **THE COURT:**  THAT'S -- YOU HAVEN'T ARTICULATED A

4    RACKETEERING ACTIVITY.

5           **MS. SANDERSON:**  THE RACKETEERING ACTIVITY WAS TO

6    DEFRAUD PLAINTIFF THROUGH WIRE.

7           **THE COURT:**  SO EVERY TIME I HAVE A FRAUDULENT

8    MISREPRESENTATION, I HAVE A RICO CAUSE OF ACTION?

9           **MS. SANDERSON:**  WHEN IT'S ASSOCIATION IN FACT BEHIND

10    IT, AND THIS IS PART OF THEIR COMMON PURPOSE AS AN ASSOCIATION

11    IN FACT --

12           **THE COURT:**  AGAIN, YOU'RE --

13           **MS. SANDERSON:**  THEN YES.

14           **THE COURT:**  -- USING CONCLUSORY WORDS FROM THE

15    STATUTE.

16           **MS. SANDERSON:**  THE DEFENDANTS HERE ARE A COLLECTION

17    OF INDIVIDUALS AND CORPORATIONS.  THAT IS OUR ASSOCIATION OF

18    IN FACT.  THEY ARE WORKING WITH A COMMON PURPOSE.  THE COMMON

19    PURPOSE IS TO DEFRAUD, INCLUDING DEFRAUD PLAINTIFF.

20    THAT'S WHERE YOU GET FROM BREACH OF CONTRACT TO RICO

21    BECAUSE THE -- THE PURPOSE -- THE COMMON PURPOSE WAS TO USE

22    FRAUD AND TO USE OTHER CRIMINAL MEANS TO AVOID PAYING

23    PLAINTIFF AND OTHERS.

24           **THE COURT:**  WHAT CASE CLOSELY -- WHAT IS THE BEST

25    CASE YOU HAVE THAT MATCHES ANYTHING CLOSE TO SAY WHAT YOU'RE

1   ATTEMPTING TO ARTICULATE HERE?

2          **MS. SANDERSON:**  *ODOM*.  *ODOM* V. *MICROSOFT*.  WE HAVE --

3   WE HAVE ALLEGED EACH OF THE ELEMENTS THAT --

4          **THE COURT:**  *ODOM* JUST HAS THE ELEMENTS.  *ODOM* IS NOT

5   THIS FACT PATTERN.  WHAT FACT PATTERN COMES ANYWHERE CLOSE TO

6   WHAT YOU'RE TRYING TO ALLEGE?

7          **MS. SANDERSON:**  WE -- WE HAVE THE CASE LAW IN OUR

8   PLEADINGS, BUT I ARGUE THAT IT DOES FOLLOW -- THAT IT DOES

9   FOLLOW *ODOM*.

10         **THE COURT:**  *ODOM* GIVES ME -- I DON'T DISAGREE THAT

11  YOU'RE SAYING THAT *ODOM* IDENTIFIES THE ELEMENTS OF A CAUSE OF

12  ACTION.  IT SAYS PLAINTIFFS MUST ALLEGE ONE, CONDUCT; TWO, OF

13  AN ENTERPRISE; THREE, THROUGH A PATTERN; FOUR, OF RACKETEERING

14  ACTIVITY.

15         **MS. SANDERSON:**  YES.

16         **THE COURT:**  THAT'S WHAT *ODOM* SAYS.

17         **MS. SANDERSON:**  AND WE ARE HERE ON A MOTION TO

18  DISMISS, AND WE ARE SAYING THAT WE HAVE ALLEGED THAT WITH MORE

19  THAN JUST CONCLUSORY ALLEGATIONS BY EXPLAINING HOW THE

20  PLAINTIFFS (SIC) HAVE COMBINED, WHAT THEIR COMMON PURPOSE IS,

21  AND WHAT THE -- THE PREDICATE ACTS WERE.

22      IT WASN'T CONCLUSORY -- WE JUST SAID, OH, THERE'S AN

23  ENTERPRISE; THEY DID PREDICATE ACTS.  WE PROVIDE DETAIL.  IT'S

24  FLESHED OUT WITH DETAIL IN OUR COMPLAINT.  IT'S NOT CONCLUSORY

25  ALLEGATIONS.

1          **THE COURT:**  RESPONSE?

2          **MR. ROTHKEN:**  YOUR HONOR, I'M HAPPY TO ANSWER ANY

3     QUESTIONS.

4          **THE COURT:**  IF YOU DON'T HAVE ANYTHING TO SAY,

5     THEN -- I ALREADY TOLD YOU I DON'T HAVE A LOT OF QUESTIONS.

6     IF YOU DON'T HAVE ANYTHING TO SAY, YOU DON'T WANT TO ARGUE,

7     WELL, THEN I GUESS THAT'S YOUR PREROGATIVE.

8       DO YOU HAVE AN ARGUMENT IN RESPONSE?

9          **MR. ROTHKEN:**  YES, YOUR HONOR.  I THINK THE THING TO

10    DO WOULD BE FOR ME TO STEP THROUGH THEIR FIVE CORE ALLEGATIONS

11    AND EXPLAIN WHY THEY'RE NOT RICO.

12         **THE COURT:**  ALL RIGHT.  COULD GO AHEAD.

13         **MR. ROTHKEN:**  AND NUMBER ONE, THEY'RE CLAIMING A

14    BREACH OF CONTRACT, AS YOUR HONOR ARTICULATED.  AND THE CORE

15    OF THEIR BREACH OF CONTRACT CLAIM IS A FAILURE TO PAY.  AND

16    THEY'RE TRYING TO CONFLATE THAT INTO FRAUD AND CLAIMING THAT

17    TO THE FAILURE TO KEEP YOUR PROMISE TO PAY NOW THROUGH A

18    CONCLUSORY ALLEGATION ELEVATES TO FRAUD AND BECAUSE PART OF

19    WHATEVER THE DISCUSSIONS WERE REGARDING THIS WAS THERE SKYPE,

20    IT'S NOW WIRE FRAUD.

21      AND WE DON'T THINK THAT SATISFIES THE RULE 9B STANDARDS

22    FOR PLEADING FRAUD WITH PARTICULARITY.  WE CERTAINLY DON'T

23    THINK IT WOULD EVEN SATISFY *IQBAL* AND *TWOMBLY* IN TERMS OF

24    MANNER AND METHOD IN WHICH THEY PLED FOR MERE CONTRACT

25    BECAUSE, AS INDICATED IN OUR BRIEF, THEY USED THE WORD

1    "DEFENDANTS." THEY WERE USING THE WORD "DEFENDANTS" LIKE THE

2    PARTIES WERE BASICALLY SAYING TO EACH OTHER, AND DEFENDANTS

3    THERE PAY YOU THIS, AND DEFENDANTS WILL PAY DO THAT, AS IF THE

4    LAWSUIT ALREADY HAPPENED AND THESE PERSONS WHO ARE DISCUSSING

5    THIS KNEW WHO THE DEFENDANTS WERE.

6    IN ORDER FOR THIS TO BE A COMPETENT PLEADING, THEY WOULD

7    HAVE TO INDICATE WHO AGREED TO THIS AGREEMENT. WHO AGREED TO

8    BE BOUND. AND WHO, IF THERE'S EVER GOING TO BE A FRAUD

9    ALLEGATION, WOULD BE RESPONSIBLE FOR ANY KIND OF

10    MISREPRESENTATIONS THAT WERE MADE.

11    WE HAVE -- SO IF YOU DON'T HAVE WIRE FRAUD, WE DON'T KNOW

12    WHO THE FOLKS ARE. WE DON'T KNOW THE WHO, WHAT -- WHO, WHAT,

13    WHEN, AND HOW. WE DON'T HAVE A FRAUD CAUSE OF ACTION.

14    AND IN TERMS OF WIRE FRAUD, YOUR HONOR, WE ALSO KNOW THAT

15    THAT HAS TO BE PLED WITH PARTICULARITY. AND AS YOUR HONOR

16    INDICATED, THERE IS NO STANDING BECAUSE THERE'S NO COMPETENT

17    PREDICATE ACT. THERE'S NO PATTERN. AT WORST IF WE WERE TO

18    EMBRACE THEIR VIEW, IT WOULD BE ONE ISOLATED EVENT. AND THERE

19    IS NO PROXIMATE CAUSE OF ANY DAMAGES THAT WERE ASSOCIATED WITH

20    THIS.

21    AND WE ALSO HAVE AS THE NEXT CORE CLAIM BASICALLY SAYING

22    THE USE OF CECASH WAS MISLEADING, LIKE SOMEHOW THAT SHOULD BE

23    ELEVATED INTO A FRAUD THAT MAKES THIS INTO A RICO ENTERPRISE

24    WHEN THEY ALSO INDICATE SOMEWHERE ELSE IN THEIR COMPLAINT THAT

25    WHEN THEY WENT OVER THE CECASH.COM WEBSITE, THEY FIGURED OUT

WHO ACTUALLY OWNED IT BY LOOKING AT THE TERMS OF USE.

AGAIN, RULE 9B PLAYS A ROLE HERE BECAUSE THEY DON'T DESCRIBE THE WHO, WHAT, WHEN, WHERE AND HOW.  THEY DON'T DESCRIBE WHO WAS INVOLVED.  THEY DON'T DESCRIBE WHO WAS MISLED.  THEY DON'T DESCRIBE REASONABLE RELIANCE.  THIS CAN'T BE WIRE FRAUD.

AND THIS IS KIND OF THE EQUIVALENT OF SOMEONE SAYING THAT THEY -- YOU KNOW, WHEN THEY REALLY WORK FOR BUENA VISTA OR PIXAR, SAYING, HEY, I WORK FOR DISNEY.  WE CAN'T ELEVATE THESE KINDS OF SIMPLISTIC ARGUMENTS INTO RICO SERIOUS CLAIMS, ESPECIALLY GIVEN THE FLIMSY NATURE OF THIS PLEADING.

THE NEXT CORE CLAIM THEY HAVE ARE THAT THE LIMITED LIABILITY COMPANIES ARE TOO COMPLEX.  FRANKLY, I DON'T UNDERSTAND THE CLAIM.  BUT TO THE EXTENT THAT THAT IS ONE OF THEIR ARGUMENTS, SILICON VALLEY AND HOLLYWOOD ARE LITTERED WITH COMPANIES THAT MAKE LIMITED LIABILITY COMPANIES FOR EACH WEBSITE FOR EACH MOTION PICTURE.  THEY -- EACH OF THESE WEBSITES AT ISSUE HAVE TERMS OF USE, WHICH THEY ADMITTED IN THEIR COMPLAINT THAT THEY KNEW WHO THE COMPANIES WERE THAT WERE INVOLVED IN RUNNING THEM.

THEY HAVE NOT PLED ANYTHING UNDER RULE 9B THAT WOULD BE SPECIFIC ENOUGH FOR US TO UNDERSTAND THE NATURE OF THE FRAUD AND ALL THE OTHER ELEMENTS ASSOCIATED WITH IT AND THE RELIANCE AND THE INJURY.  AND IT CERTAINLY CAN'T ACT AS A PREDICATE FOR RICO.

1    WE THEN TURN TO THIS CLAIM THAT THEY'VE ADDED IN THEIR

2  FIRST AMENDED COMPLAINT.  I'D LIKE THE COURT TO BE REMINDED

3  THAT WE DID FILE A MOTION TO DISMISS THEIR ORIGINAL COMPLAINT,

4  AND THEY CAME UP WITH THEIR FIRST AMENDED COMPLAINT.  AND IT'S

5  RELATIVELY THE SAME, BUT THEY DID ADD THIS ONE THING.  THEY

6  DIDN'T LEARN FROM OUR ARGUMENTS THE FIRST TIME AROUND.

7    THEY ADD THIS THING CALLED DECLINERS.  AND, AGAIN, IT'S

8  HARD TO REALLY UNDERSTAND WHAT IT IS.  IT -- IT LOOKS AND

9  SOUNDS WHOLLY ERRONEOUS.  BUT IF I CAN UNDERSTAND WHAT THEY'RE

10  CLAIMING, THEY'RE SAYING SOMETHING ALONG THE LINES OF THERE'S

11  A CERTAIN GROUP OF CONSUMERS WHOSE CREDIT CARDS ARE DECLINED

12  BECAUSE SOME OF THE DEFENDANTS ARE USING FOREIGN CREDIT CARD

13  PROCESSORS, AND THEY HAVE DIFFERENT STANDARDS, AND SO -- THESE

14  DECLINED CONSUMERS ARE THEN SENT OVER TO OTHER FOLKS WHO

15  ATTEMPT TO PROCESS THEM.

16    THIS CLAIM, WHEN IT'S READ CAREFULLY, IS DEVOID OF ANY

17  FACTS.  AND, IN FACT, THIS ONE'S PARTICULARLY EGREGIOUS

18  BECAUSE THEY JUST USE A HYPOTHETICAL IN REPLACEMENT OF FACTS

19  AND THEN TRY CONFLATING THE HYPOTHETICAL INTO SOMETHING LIKE

20  ITS ACTUAL PLEADING, AND IT'S NOT.

21    HERE, THEY'RE CLAIMING SOMEHOW THAT THIS IS A PREDICATE

22  ACT, THAT IT'S FRAUD, AND THAT THE BANKS AND CONSUMERS

23  ESSENTIALLY WHO ARE THE VICTIMS OF THIS BUT SOMEHOW WITHOUT

24  EXPLAINING ANYTHING IN THE COMPLAINT ON PROXIMATE CAUSE AND

25  RICO, THE PLAINTIFF'S CLAIMING SOMEHOW THEY'RE INJURED BY

1    THIS, HOW THEY HAVE STANDING.

2        IT SOUNDS MORE LIKE A CLASS-ACTION LAWSUIT FOR A CONSUMER

3    ATTORNEY OR BANK ATTORNEY THAN ANYTHING THAT WOULD HAVE

4    STANDING IN THIS COURTROOM IN THIS CASE.

5        AND THEN THEY MAKE THESE (SIC) ARGUMENT THAT BY USING A

6    FOREIGN BANK, THAT SOMEHOW THEY'RE INJURED BY THAT, BASICALLY

7    MAKING UP A CONTRACT PROVISION WHICH DOESN'T EXIST -- IT'S NOT

8    ARTICULATED -- OF SOME FAKE COVENANT THAT YOU HAVE TO USE ONLY

9    U.S. BANKS.

10       THEY ALSO FRANKLY DIDN'T INDICATE IN THE COMPLAINT THE

11   COMPLEXITIES OF VISA AND MASTERCARD INTERNATIONAL VERSUS

12   U.S.A.  THEY DO ACKNOWLEDGE IN THE COMPLAINT THAT THESE

13   WEBSITES ARE FOREIGN OWNED.  THEY'RE NOT U.S. WEBSITES.  ONE

14   WOULD AT LEAST IMAGINE THAT FOREIGN WEBSITES WOULD HAVE SOME

15   REQUIREMENTS ON USING INTERNATIONAL BANKS AS OPPOSED TO U.S.

16   BANKS FOR CREDIT CARD PROCESSING, BUT THAT'S NOT EXPLAINED.

17       AND IN ANY EVENT, IT'S NOT A PREDICATE ACT.  IT'S NOT PLED

18   WITH PARTICULARITY.  THERE'S NOT ENOUGH SPECIFICITY ON THE

19   REGISTRATION PATH USERS WENT -- CONSUMERS WENT THROUGH, WHAT

20   THEY WERE TOLD, WHAT THEY RELIED ON, AND WHAT THEIR TERMS OF

21   USE ARE, AND EXACTLY WHAT HAPPENED IF THIS EVER EVEN OCCURRED.

22       THEY'RE NEXT ATTEMPT AT CREATING A PREDICATE ACT IS

23   POST-LITIGATION, WHAT THEY CALL KIND OF TREATMENT OF

24   WITNESSES, PRIMARILY AIMED AT SOMETHING THAT HAPPENED IN A

25   PHOENIX TRADE SHOW WHERE THE BEST THAT WE COULD TELL, IT LOOKS

1 LIKE JUST FROM THE FEW FACTS THAT THEY ALLEGED, SOME OF THE

2 DEFENDANTS WERE GIVING THEIR VIEWS ON THE MERITS OF

3 PLAINTIFF'S LAWSUIT AND PROVIDING THEIR OWN ASSOCIATES OR

4 THEIR OWN CUSTOMERS WITH THINGS THAT ONE DOES IN AN AFFILIATE

5 PROGRAM, WHICH IS HOTELS ROOMS, AND THINGS OF THAT NATURE.

6 THERE CERTAINLY WASN'T ANYTHING ALLEGED THAT ARISES TO THE

7 KIND OF CRIMINAL MISCONDUCT AND THE PARTICULARITY REQUIRED BY

8 RICO IN THIS CONTEXT TO RAISE IT TO TAMPERING OF WITNESSES.

9 WHAT THIS LOOKS LIKE IS NORMAL BUSINESS AFFAIRS AND THEN A

10 DEFENDANT -- A CORPORATE DEFENDANT DOING WHAT THE FORTUNE

11 1,000 DOES IN THE FAST MAJORITY OF LITIGATIONS BROUGHT AGAINST

12 THEM WHERE THEY PROCLAIM THROUGH THEIR PUBLIC RELATIONS

13 PERSONNEL THAT THE CLAIMS HAVE NO MERITED.

14 AND THAT'S NOT THE MAKINGS OF A RICO CLAIM. NOT THE

15 MAKINGS OF PREDICATE ACTS AND CERTAINLY THERE WAS NO PROXIMATE

16 CAUSE, INJURY, THINGS OF THAT NATURE THAT WERE ALLEGED.

17 SO WE'RE THEN LEFT, YOUR HONOR -- THOSE ARE THE TOP FIVE.

18 WE'RE LEFT WITH THIS WHOLE CONCEPT OF --

19 **THE COURT:** I GUESS I ONLY HEARD YOU ARTICULATE FOUR.

20 SO GIVE ME THE -- THE HEADLINE AGAIN. THE BREACH OF

21 CONTRACT --

22 **MR. ROTHKEN:** ALL RIGHT.

23 **THE COURT:** -- WAS ONE.

24 **MR. ROTHKEN:** YES. I'M SORRY, YOUR HONOR.

25 I MELDED TWO TOGETHER, THE BREACH OF CONTRACT AND THE

1  FAILING TO PAY.  THE USE OF C --

2        **THE COURT:**  SO THAT IS TWO?

3        **MR. ROTHKEN:**  THAT'S ONE.

4     THE CECASH AND THE OTHER -- ALLEGATION THAT IT'S

5  MISLEADING.  THE USE OF LIMITED LIABILITY COMPANIES IN A

6  COMPLEX RELATIONSHIP.  THE MECHANISM OF DECLINERS AND -- AND

7  HANDLING -- HANDLING THEM OFF TO OTHER BANKS AND OTHER

8  COMPANIES.

9     THE TREATMENT OF WITNESSES.  AND THEN THE NEXT ONE WHICH I

10  MELDED TOGETHER, WHICH I SHOULDN'T HAVE, WHICH IS COMMENTS

11  ABOUT THE LITIGATION.

12    OR -- AND THAT ONE IS MORE GEARED TOWARDS THEIR LANHAM ACT

13  CLAIM.

14    AND I'D LIKE TO MAKE THIS POINT ABOUT THE LANHAM ACT.

15  THERE IS NOT A LOT OF CASES ACTUALLY ON THE LANHAM ACT WHEN WE

16  LOOK THROUGH THEM.

17        **THE COURT:**  YOU'RE RIGHT.  I HAD TO TRY A CASE AND

18  FIGURE OUT JURY INSTRUCTIONS ON THE LANHAM ACT.

19        **MR. ROTHKEN:**  AND -- YES.  AND I BEEN DOING THIS FOR

20  20 YEARS, AND I'M STILL PERPLEXED BY MANY ASPECTS OF IT, TO

21  BE -- TO BE QUITE FRANK, BUT OUR ARGUMENT ABOUT THE LANHAM ACT

22  HERE -- SO LANHAM ACT IS DESIGNED IN THIS CONTEXT TO BE ABOUT

23  PROMOTIONS AND ADVERTISEMENTS AIMED AT GOODS AND SERVICES FOR

24  AN APPRECIABLE IMPACT ON CONSUMERS.

25    DISCUSSING THE MERITS OF A CASE OR YOUR DISAGREEMENT OVER

1    CONTRACTUAL RELATIONS IN ONE-OFF CONVERSATIONS -- AND BASED ON

2    THE ALLEGATIONS, IT LOOKS LIKE IT COULD HAVE BEEN COULD HAVE

3    ALL BEEN IN PHOENIX -- THAT IS NOT PROMOTION OR ADVERTISEMENTS

4    RELATED TO GOODS AND SERVICES.  THAT'S DISCUSSION OF WHAT YOU

5    THINK OF A CONTRACT OR -- OR A LITIGATION.  THAT'S PROTECTED

6    SPEECH.  AND THERE'S A COLLISION BETWEEN PROTECTED SPEECH AND

7    THE LANHAM ACT.  AND THE LANHAM ACT DOES HAVE A VERY SENSITIVE

8    BALANCE TO MAKE SURE IT DOESN'T REACH TOO FAR.

9        AND, AGAIN, I MADE THE POINT BEFORE THAT POINT IF WE GO

10    TOO FAR WITH THIS, WE'RE GOING TO REACH STANDARD BUSINESS

11    CONDUCT AND WE'LL OPEN THE FLOOD GATES TO MAKE ALMOST ANY

12    CONTRACT CLAIM INTO A LANHAM ACT CLAIM, ESPECIALLY AFTER THE

13    CONTRACT CLAIM IS FILED AND YOU HAVE FOLKS GOING OFF AND

14    DISCUSSING HOW THEY DISAGREE WITH IT OR THEY DON'T LIKE WHAT

15    THE PLAINTIFF DID, OR HAVING ONE OFF-CONVERSATIONS IN HOTELS

16    ABOUT THE PLAINTIFF'S LAWSUIT OR THEIR VIEWS ABOUT THE CASE.

17        IN SOME OTHER CONTEXTS, ONE MAY EVEN CONSIDER THAT TO BE A

18    SLAP.

19        THEN WE HAVE A SITUATION WHERE BECAUSE IT WASN'T PLED WITH

20    SUFFICIENT PARTICULARITY, IT'S HARD TO EVEN SEE HOW THIS WAS

21    EVEN USED IN INTERSTATE COMMERCE, WHICH WAS A PREREQUISITE FOR

22    THE IMPLEMENTATION OF LANHAM ACT.

23        DID FIND ONE CASE RECENTLY WHERE A COURT FOUND THAT

24    BECAUSE THERE WERE DISCUSSIONS BASICALLY AND -- THAT WERE KIND

25    OF MICRO-DISCUSSIONS IN A LOCATION, IT WASN'T INTERSTATE

1   COMMERCE.

2       SO HERE, IT LOOKS LIKE THAT IS NOT -- INTERSTATE COMMERCE

3   PRONG HAS NOT BEEN REACHED.

4       IN ANY EVENT, THE THINGS THAT HAPPEN HERE DO NOT IMPLICATE

5   THE LANHAM ACT, WHETHER IT'S COUCHED IN LOOKING AT THE FOUR

6   CORNERS OF THE STATUTE OR COUCHED IN TERMS OF -- OF A RULE OF

7   REASON.

8       AS FAR AS -- THOSE ARE THE PRONGS.

9       I WANT TO DISCUSS ENTERPRISE JUST FOR A SECOND BECAUSE

10  IT'S KIND OF SIMILAR TO WHY THE CONTRACT CLAIM FAILS.  BECAUSE

11  WHEN YOU LOOK AT THE FOUR CORNERS OF THE COMPLAINT, THERE'S

12  JUST A WHOLE BUNCH OF ENTITIES AND PERSONS, YOU KNOW, INCLUDED

13  IN THAT.  MS. LUHAR FORTUNATELY WE GOT DISMISSED.

14          **THE COURT:**  I WAS GOING TO ASK ABOUT THAT.  SO LUHAR?

15          **MR. ROTHKEN:**  YES.

16          **THE COURT:**  SHE'S -- IS THAT ON -- ON THE DOCKET?

17          **MR. ROTHKEN:**  YES.

18          **THE COURT:**  OKAY.

19      GO AHEAD.

20          **MR. ROTHKEN:**  AND THEY'RE USING AN ASSOCIATION IN

21  FACT ENTERPRISE THEORY IN THEIR COMPLAINT.  AND WE'RE MINDFUL

22  THAT THE SUPREME COURT AND NINTH CIRCUIT TAKES ACTUALLY A MORE

23  EMBRACING VIEW FOR THE PLAINTIFF IN DETERMINING WHAT AN

24  ASSOCIATION-IN-FACT ENTERPRISE IS.

25      BUT THE CASES ALSO SAY THAT YOU GOT TO HAVE MORE THAN JUST

1    LUMPING EVERYONE TOGETHER IN CONCLUSORY WAY AND SAYING THEY'RE

2    ALL AIDERS AND ABETTORS OR COCONSPIRATORS OR THEY'RE INVOLVED.

3        THERE NEEDS TO BE ACTUALLY A DESCRIPTION OF WHO A PARTY

4    IS, WHAT THEY'RE ROLE IS, WHEN THEY WERE INVOLVED, SO THAT

5    WE'RE NOT ENGULFING IN AN OVERBROAD MANNER -- EVEN IF ONE

6    COULD ACTUALLY MAKE OUT A PREDICATE ACT -- FOLKS WHO MEANT NO

7    HARM, FOLKS WHO OUGHT NOT BE TARNISHED BY BEING INVOLVED IN A

8    RICO CASE JUST BECAUSE THEY HAPPEN TO HAVE A CORPORATE FORUM.

9        AND SO THIS CLAIM IS WHOLLY DEFICIENT IN LAYING OUT THE

10   INFORMATION THAT RICO WOULD REQUIRE TO DETERMINE IF EVERYTHING

11   ELSE WAS TRUE, IF -- IF YOU COULD GET TO FIRST BASE ON

12   STANDING.  AND IF YOU CAN GET TO FIRST BASE ON -- ON PREDICATE

13   ACTS, AND A PATTERN, AND THE PATTERN IS NOT THERE AT ALL, AND

14   IF YOU COULD SHOW PROXIMATE CAUSE, WELL, WHO OUGHT TO BE

15   NAMED?

16       AND HERE IT LOOKS LIKE IT'S -- IT'S VOID OF ANY KIND OF

17   PARTICULARITY FOR THERE TO BE ANY GOOD-FAITH UNDERSTANDING.

18   AND AS A SYMPTOM OF THAT, WE HAD MS. LUHAR DISMISSED AND,

19   FRANKLY, WE'RE HOPING THAT YOUR HONOR DISMISSES THE RICO

20   CLAIMS WITH PREJUDICE SO THAT WE'RE NOT FORCED TO BRING

21   MOTIONS FOR SUMMARY JUDGMENT OR GO THROUGH BURDENSOME

22   ELECTRONIC DISCOVERY FOR FOLKS WHO SHOULD NEVER BE INVOLVED IN

23   ANY KIND OF FEDERAL ACTION.

24       THIS -- YOUR HONOR, THIS CASE IS AT MOST GARDEN-VARIETY

25   BREACH OF CONTRACT CASE BY SOME GENTLEMAN WHO SIGNED UP FOR AN

1    ONLINE AFFILIATE PROGRAM, WHO'S TRYING TO AVOID THE

2    BOILERPLATE TERMS OF USE AND THE ARBITRATION CLAUSE AND TO

3    ENGULF A BOATLOADFULL OF -- OF PERSONS TO BASICALLY MAKE A

4    FEDERAL CASE OUT OF SOMETHING THAT BELONGS, FRANKLY, IN STATE

5    COURT OR ARBITRATION.

6        SO I'LL BE HAPPY TO ANY ANSWER ANY OTHER QUESTIONS --

7        **THE COURT:**  WELL, I SAW THE ISSUE WITH RESPECT TO

8    ARBITRATION.  SO -- IN TERMS OF THE REPLY, BUT THERE IS NO

9    MOTION TO COMPEL ARBITRATION THAT HAS BEEN BROUGHT.

10       **MR. ROTHKEN:**  THAT IS CORRECT, YOUR HONOR.  THE IRONY

11   OF THIS IS THAT THE THREE ENTITIES WHO ACTUALLY RUN THE

12   WEBSITES WHERE TRAFFIC WAS SENT, WHERE AS AN OFFER OF PROOF,

13   PLAINTIFF CLICKED THROUGH ON THE AFFILIATE PROGRAM TERMS OF

14   USE.  THEY'RE THE ONES WITH THE ARBITRATION CLAUSE.  THEY HAVE

15   NOT BEEN SERVED.  AND THEY'RE SITTING IDLY BY HOPING THAT THIS

16   RICO CLAIM IS THE DISMISSED.

17       **THE COURT:**  AND WHO ARE THOSE THREE?

18       **MS. SANDERSON:**  FROM MEMORY, YOUR HONOR, BY THEIR

19   TRADE NAMES, IT WOULD BE CECASH.COM, WHICH I THINK IS HARKLET.

20   IT WOULD BE CITYSEX.COM, WHICH I THINK IS NAUTELL.  AND IT

21   WOULD BE IBALLERS, WHOSE CORPORATE NAME I FORGOT.

22       THEY EACH HAVE ARBITRATION CLAUSES.  ONE OF THEM -- TWO OF

23   THEM ARE FOR LOS ANGELES, ONE'S FOR JAMS, ONE'S FOR ADR

24   SERVICES.  ONE'S IN CYPRESS.  I MET AND CONFERRED WITH COUNSEL

25   AT THE BEGINNING OF THE CASE AND OFFERED TO HAVE THIS CASE GO

1    TO ARBITRATION, AND THEY DECLINED.

2        WE MET AGAIN DURING OUR MEET AND CONFER FOR THE CASE

3    MANAGEMENT CONFERENCE STATEMENT.  WE OFFERED TO HAVE THE WHOLE

4    THING GO TO ARBITRATION.  THEY DECLINED.

5        THOSE THREE PARTIES ARE NOT -- THEY BELIEVE THIS CASE IS

6    MALICIOUS.  THEY BELIEVE THAT IF THERE'S GOING TO BE A CLAIM,

7    IT OUGHT TO BE ARBITRATED, AND SO THEY'RE SITTING ON THE

8    SIDELINES WATCHING WHAT HAPPENS WITH THIS MOTION TO DISMISS.

9            **THE COURT:**  I WENT THROUGH THE DEFENDANTS HERE, SO WE

10   HAVE THEN THREE INDIVIDUAL DEFENDANTS WHO HAVE BEEN SERVED.

11   YOUR 120 DAYS IS UP TOMORROW.  YOU UNDERSTAND THAT.

12           **MS. SANDERSON:**  WE -- WE RECEIVED AN EXTENSION FROM

13   THE COURT THAT GOES TO NOVEMBER.  AND THE PROCESSOR SERVERS IN

14   CYPRESS ARE WORKING ON SERVING THE CYPREATE (PHONETIC)

15   DEFENDANTS.

16           **THE COURT:**  WHICH IS THE CYPRESS DEFENDANTS?

17           **MS. SANDERSON:**  CYPRESS DEFENDANTS ARE HARKLET

18   ENTERPRISES; NUNATON COMPANY AND NAUTELL CAPITAL, AND ALACRE

19   TRADING, THOSE FOUR.

20           **THE COURT:**  NUNATON COMPANY IS CYPRESS AS WELL?

21           **MS. SANDERSON:**  YES.  YES.

22           **THE COURT:**  AND THEN WHAT ABOUT CASH TRAFFIC?

23           **MS. SANDERSON:**  CASH TRAFFIC WE WERE UNABLE TO SERVE

24   BECAUSE WE HAVEN'T BEEN ABLE TO DETERMINE THE JURISDICTION OF

25   THAT COMPANY WHERE IT'S ORGANIZED.

1      **THE COURT:** DO YOU HAVE ANY INFORMATION ON CASH

2  TRAFFIC?

3      **MR. ROTHKEN:** I CAN LOOK IT UP RIGHT NOW. MAY I HAVE

4  A SECOND, YOUR HONOR?

5                  (PAUSE IN THE PROCEEDINGS.)

6      **MR. ROTHKEN:** OKAY. LET'S SEE.

7      **THE COURT:** HAS THERE BEEN ANY THOUGHT OF THE CYPRESS

8  COMPANIES ACCEPTING SERVICE?

9      **MR. ROTHKEN:** YES, YOUR HONOR. THERE HAS BEEN

10  THOUGHT, BUT THERE -- THERE'S OTHER COUNSEL ALSO WORKING IN

11  THIS. CYPRESS OBVIOUSLY IS A EUROPEAN UNION, AND THEY HAVE AN

12  ARBITRATION CLAUSE FOR CYPRESS. AND AT THIS POINT, THEY WANT

13  TO ASSERT THEIR RIGHTS BECAUSE THEY THINK THE CLAIM IS

14  FRIVOLOUS, AND THEY DID OFFER WITHOUT ANY FANFARE AT ALL JUST

15  TO ARBITRATE. IT IS NOT DIFFICULT TO SERVE SOMEONE IN THE

16  EUROPEAN UNION.

17    IN TERMS OF --

18      **THE COURT:** AND CECASH IS HARKLET; IS THAT CORRECT?

19      **MR. ROTHKEN:** YES, YOUR HONOR. YOU ASKED ABOUT --

20      **THE COURT:** CASH TRAFFIC LIMITED.

21      **MR. ROTHKEN:** YEAH. THAT'S -- CASHTRAFFIC.COM IS

22  OWNED BY NUNATON COMPANY LIMITED. WE DON'T HAVE SOMETHING

23  CALLED CASH TRAFFIC LIMITED IN OUR SPREADSHEET HERE, SO IF IT

24  DOES EXIST, I APOLOGIZE, BUT --

25      **THE COURT:** WELL, I WAS JUST TAKING --

1        **MR. ROTHKEN:** SO CASH TRAFFIC LIMITED IS A DEFUNCT

2    COMPANY. IT DOESN'T EXIST ANYMORE.

3        **THE COURT:** IT WAS HELPFUL, TO ME, MS. SANDERSON TO

4    AT LEAST UNDERSTAND FROM THE DEFENDANTS' PERSPECTIVE WHAT THEY

5    UNDERSTOOD YOUR FACTUAL PREDICATE TO BE IN SPECIFIC TERMS,

6    WHICH IS WHAT I WAS ATTEMPTING TO GET YOU TO ARTICULATE.

7    IF YOU'D LIKE, YOU CAN RESPOND TO THOSE PRECISE ARGUMENT

8    ARTICULATIONS OF THE PREDICATE ACTS HERE. YOU DON'T NEED TO

9    GO BACK ON THE BREACH OF CONTRACT. I GOT THAT ONE FROM YOU.

10    BUT THE OTHER FOUR, YOU CAN RESPOND IF YOU'D LIKE.

11        **MS. SANDERSON:** SURE.

12    THE SECOND ONE, THAT THERE WAS FRAUD BY REPRESENTING THAT

13    DEFENDANTS WERE A SINGLE ENTITY CALLED CECASH. COUNSEL HAS

14    MADE MANY ARGUMENTS ABOUT HOW THIS IS A COMMON PRACTICE.

15    TO --

16        **THE COURT:** WELL, HOLD ON. FIRST OF ALL, IS THAT --

17    IS IT YOUR VIEW THAT THAT'S A PREDICATE ACT?

18        **MS. SANDERSON:** YES.

19        **THE COURT:** OKAY.

20        **MS. SANDERSON:** AND OUR VIEW THAT DIFFERENTIATES IT

21    FROM JUST AN ORDINARY CORPORATION -- YOU KNOW, CORPORATE

22    CONGLOMERATE USING VARIOUS LLC'S OR BUSINESSES IS THAT THEY

23    ARE NOT USED WITH THE INTENTION OF DEFRAUDING. THEY ARE USED

24    WITH INTENTION OF ISOLATING LIABILITY BUT NOT TO INTENTIONALLY

25    CONFUSE THOSE WITH WHICH THEY DO BUSINESS.

1    AND WE BELIEVE THAT'S THE DIFFERENCE HERE.  AND THAT'S THE

2  DIFFERENCE BETWEEN JUST A CORPORATION THAT HAS A LOT OF

3  SUBSIDIARIES AND AN ASSOCIATION IN FACT, IS THE COMMON PURPOSE

4  TO DEFRAUD.

5    AND HERE, SPECIFICALLY, WITH RESPECT TO THIS PLAINTIFF,

6  THE INTENT WAS TO DEFRAUD PLAINTIFF INTO THINKING HE WAS DOING

7  BUSINESS WITH A SINGLE ENTITY THAT DOES BUSINESS AS CECASH.COM

8  AND ONLY AFTERWARDS WHEN HE TRIES TO FIGURE OUT WHO OWES ME

9  THIS MONEY UNDER THIS CONTRACT, IS IT CLEAR THAT IT IS A WEB

10  INTENDED TO DECEIVE INCLUDING THAT, YOU KNOW, ONE OF THE

11  COMPANIES THAT'S TIED TO ONE OF THE WEBSITES AT ISSUE, WE HAVE

12  JUST LEARNED IS DEFUNCT.

13    WE'VE ALSO HAD A ISSUE IN THE CASE WHERE WE HAVE INTERNET

14  LIVE, INTERNET BRAND, AND INTERNET BUSINESS SERVICES, THEY'VE

15  EACH FILED A SEPARATE MOTION TO DISMISS.  THEY'VE EACH

16  APPEARED SEPARATELY IN THE CASE, ONLY AT ONE POINT TO BE,

17  LIKE, OH, WE JUST REMEMBERED INTERNET BUSINESS SERVICES IS A

18  DBA OF ONE OF THE OTHER ONES; WE'LL FIGURE OUT WHO.

19    IT'S THESE -- THIS PROBLEM, THIS WEB THAT EVEN DEFENDANTS

20  THEMSELVES CANNOT KEEP STRAIGHT THAT ELEVATES THIS TO AN

21  ASSOCIATION-IN-FACT ENTERPRISE.

22      **THE COURT:**  ANYTHING ELSE?

23      **MS. SANDERSON:**  AS TO THE SECOND ELEMENT, NO.

24    AS TO THE ISSUE REGARDING THE SALE OF DECLINE TRAFFIC, AS

25  WE STATED IN OUR OPPOSITION, THE HYPOTHETICAL WAS PROVIDED FOR

1  BACKGROUND INFORMATION.  IT CAN BE COMPLETELY DISREGARDED AND

2  THE CLAIM STILL STANDS.  WE ARE NOT ASKING THE COURT TO DECIDE

3  THAT WE'VE STATED A CLAIM FOR THIS PARTICULAR PREDICATE ACT OF

4  FINANCIAL INSTITUTION FRAUD BASED ON THE HYPOTHETICAL

5  WHATSOEVER.

6      PLAINTIFF HAS BEEN INJURED.  PLAINTIFF IS WITHIN THE CLASS

7  OF PEOPLE WHO HAVE BEEN INJURED BY THIS ACTIVITY IN THAT

8  TRAFFIC THAT HE SHOULD, UNDER THE CONTRACT, GET A COMMISSION

9  OR REFERRAL FEE FOR IS DIVERTED ELSEWHERE.  HAS DECLINED

10  TRAFFIC.

11      WHEN WE GET TO THE ARGUMENT ABOUT --

12          **THE COURT:**  -- THAT'S THE PREDICATE ACT.

13          **MS. SANDERSON:**  -- FINANCIAL INSTITUTION FRAUD AND

14  MONEY LAUNDERING --

15              (PAUSE IN THE PROCEEDINGS.)

16          **MS. SANDERSON:**  WHEN WE GET TO COUNSEL'S ARGUMENTS

17  THAT WE'RE SAYING THE LLC SITUATION IS TOO COMPLEX, I BELIEVE

18  THAT I'VE ALREADY ADDRESSED THAT, THAT WE'RE NOT SAYING THAT

19  HAVING MULTIPLE LLC'S OR EVEN HAVING INTERNATIONAL LLC'S IS A

20  PROBLEM.  IT'S WHEN THEY'RE PURPOSELY USED TO DEFRAUD, MISLEAD

21  AND CONCEAL THAT IT'S A PROBLEM, THAT IT BECOMES AN

22  ASSOCIATION IN FACT.

23      AND AS TO THE LANHAM ACT CLAIMS, OUR --

24          **THE COURT:**  WELL, YOU HAVEN'T DEALT WITH THE

25  POST-LITIGATION DISCUSSIONS WITH INDIVIDUALS.

1        **MS. SANDERSON:** THE POST-LITIGATION DISCUSSIONS WITH

2 INDIVIDUALS, AGAIN, IT'S NOT WRONG TO TALK ABOUT A CASE WITH

3 THIRD PARTIES. HERE, THOUGH, THE ELEVATING FACTOR IS THAT IT

4 WAS DONE -- FAVORS WERE GIVEN IN EXCHANGE FOR FAVORABLE

5 TESTIMONY. THAT EXCHANGE IS, YOU KNOW, THE PREDICATE ACT OF

6 WITNESS TAMPERING.

7        **THE COURT:** WHERE ARE THERE ALLEGATIONS ABOUT WHAT

8 THEY'VE ASKED THEM TO TESTIFY TO?

9        **MS. SANDERSON:** THEY ARE IN -- IF YOU'LL JUST GIVE ME

10 ONE MOMENT.

11        **THE COURT:** YOU HAVE WITNESSES WHO'VE SAID THAT THEY

12 WERE TOLD TO MAKE CERTAIN STATEMENTS DURING LITIGATION?

13        **MS. SANDERSON:** WE HAVE A REPRESENTATION FROM COUNSEL

14 THAT THEY OBTAINED A FAVORABLE DECLARATION, SO SWORN

15 TESTIMONY, FROM ONE OF THESE WITNESSES THAT IS CONTRARY TO

16 WHAT THE WITNESS PREVIOUSLY HAD TOLD US WAS THEIR POSITION OF

17 EVENTS, AND IT HAPPENED AFTER THESE FAVORS WERE GIVEN TO THE

18 WITNESSES.

19        **THE COURT:** WHERE IS THAT?

20        **MS. SANDERSON:** IT IS --

21        (PAUSE IN THE PROCEEDINGS.)

22        **MS. SANDERSON:** THE GENERAL SECTION BEGINS IN

23 PARAGRAPH 94 OF THE FIRST AMENDED COMPLAINT. SPECIFIC TO THE

24 TESTIMONY THAT WAS ELICITED, PARAGRAPHS 105 THROUGH 107.

25        (PAUSE IN THE PROCEEDINGS.)

1        **MS. SANDERSON:** TO CLARIFY --

2        **THE COURT:** AND YOU ARE MAKING THESE REPRESENTATIONS

3  IN A PLEADING TO THE COURT UNDER YOUR OBLIGATIONS UNDER

4  FEDERAL RULE --

5        **MS. SANDERSON:** YES, YOUR HONOR.

6        **THE COURT:** -- 11 KNOWING WHAT? WHAT IS THE -- WHAT

7  IS THE KNOWLEDGE UPON WHICH YOU'VE MADE THESE ALLEGATIONS?

8        **MS. SANDERSON:** WE HAVE WITNESSES IN THE CASE WHO

9  TOLD OUR CLIENT PRIOR TO FILING THE CASE THAT THEY SIDED WITH

10  OUR CLIENT'S SIDE OF EVENTS.

11        **THE COURT:** YOU HAVE INDEPENDENT OBLIGATIONS AS AN

12  OFFICER OF THE COURT. WHAT HAVE YOU DONE?

13        **MS. SANDERSON:** I'M RELYING ON MY CLIENT, WHICH I'M

14  ALLOWED TO RELY ON THE INFORMATION THAT MY CLIENT HAS PROVIDED

15  ME BECAUSE I HAVE NOT UNCOVERED ANYTHING TO THE CONTRARY.

16    AND THEN I'M RELYING ON THE FACT THAT -- AND IS IT SEEMS

17  TO BE ADMITTED HERE IN COURT THAT THERE WAS A CONVENTION AND

18  FAVORS WERE GIVEN TO THESE WITNESSES.

19    AND THEN I'M RELYING ON COUNSEL'S REPRESENTATION THAT THEY

20  HAD OBTAINED TESTIMONY, A SWORN DECLARATION, THAT COMPLETELY

21  CONTRADICTED WHAT THE WITNESS, PRIOR TO THE FAVORS, HAD TOLD

22  MY CLIENT THAT THEY --

23        **THE COURT:** WELL, WHY DO WE HAVE TO TALK IN

24  GENERALITIES? WHAT IS IT? TELL ME WHAT IT IS.

25        **MS. SANDERSON:** COUNSEL WILL NOT -- HAS NOT PRODUCED

1    THE DECLARATION FOR ME.

2            **THE COURT:**  SO YOU DON'T KNOW -- YOU DON'T HAVE ANY

3    SPECIFICS?

4            **MS. SANDERSON:**  I DO -- IT HAS BEEN INDICATED, AND I

5    WANT TO BE CLEAR THAT IT'S INDICATED, TO -- TO US THAT THE

6    WITNESS IS GOING TO SAY THAT THEY ALWAYS UNDERSTOOD THAT THEY

7    WERE NEVER -- PLAINTIFF WAS NEVER GOING TO BE PAID A REFERRAL

8    FEE FOR REACTIVATING THIS NETWORK'S ACCOUNT WITH THE

9    DEFENDANTS.

10           **THE COURT:**  SO A THIRD-PARTY WITNESS --

11           **MS. SANDERSON:**  YES.

12           **THE COURT:**  -- TOLD YOUR CLIENT WHO TOLD YOU THAT THE

13   DEFENDANTS TOLD THE THIRD-PARTY WITNESS THAT THEY WEREN'T

14   GOING TO BE PAID?  AND THAT'S THE BASIS UPON WHICH WE HAVE --

15           **MS. SANDERSON:**  NO.

16           **THE COURT:**  -- PARAGRAPHS 105 THROUGH -7?

17           **MS. SANDERSON:**  THE WITNESS TOLD MY CLIENT, YES, YOU

18   SHOULD GET PAID FOR THE REFERRAL AS A RESULT OF REFERRING AND

19   REACTIVATING OUR COMPANY.  THE WITNESS THEN WENT TO A

20   CONVENTION.  THEY WERE BUMPED UP TO A DIFFERENT HOTEL THAT WAS

21   FAR AWAY FROM MY CLIENT.  THEY WERE TREATED TO LUXURY DINNERS,

22   AFTER WHICH COUNSEL HAS REPRESENTED THAT THEY OBTAINED A

23   DECLARATION FROM THE WITNESS INDICATING THAT THE WITNESS WILL

24   SAY NO, IT WAS MY UNDERSTANDING THEY WERE NEVER TO BE PAID

25   REFERRALS FOR REACTIVATING OUR COMPANY WITH DEFENDANT, THE

1  COMPLETE OPPOSITE.

2          **THE COURT:**  IS THERE ANYTHING ELSE THAT FORMS THE

3  BASIS OF THAT ALLEGATION?

4          **MS. SANDERSON:**  THAT'S THAT, YOUR HONOR.

5      WE HAVE HAD -- I MEAN, WE'VE HAD ISSUES WHERE WE'VE TRIED

6  TO SERVE SUBPOENAS ON THIS WITNESS THAT --

7          **THE COURT:**  I BELIEVE THAT JUDGE CORLEY'S HANDLING

8  THAT.

9          **MS. SANDERSON:**  SHE DID.

10          **THE COURT:**  SO --

11          **MS. SANDERSON:**  SHE DID STAY IT.  OUR ISSUE WAS THAT

12  THE COUNSEL FOR THE WITNESS APPEARS TO HAVE BEEN RETAINED BY

13  DEFENDANTS.

14          **THE COURT:**  AND WHY IS IT THAT THIS WITNESS'S OPINION

15  MATTERS IF THERE'S A CONTRACT?

16          **MS. SANDERSON:**  BECAUSE THERE WAS A REFERRAL.  THE

17  WHOLE BASIS OF THE CONTRACT IS I'M GOING TO REFER THESE

18  CLIENTS.  I THEREFORE REFERRED THIS WITNESS, THIS CLIENT, AND

19  SO THEIR TESTIMONY IS RELEVANT AS TO WHAT EVERYONE'S

20  UNDERSTANDING WAS AT THE TIME OF THE REFERRAL.

21          **THE COURT:**  ISN'T THERE SOME WRITING THAT DOCUMENTS

22  THAT THE PLAINTIFF REFERRED A PARTICULAR PARTY?

23          **MS. SANDERSON:**  WE BELIEVE SO, YES.

24          **THE COURT:**  IS THE ARGUMENT THAT -- DOES HE HAVE AN

25  OPINION --

1        **MS. SANDERSON:**  YES.

2        **THE COURT:**  -- THAT --

3        **MS. SANDERSON:**  THAT THEY'RE GOING TO SAY THAT

4  PLAINTIFF WAS MISTAKEN.

5        **THE COURT:**  THAT PLAINTIFF WAS MISTAKEN ABOUT WHAT?

6        **MS. SANDERSON:**  AS TO WHETHER HE WAS GOING TO EARN A

7  REFERRAL FEE.

8        **THE COURT:**  LOOK, THAT'S -- THAT'S -- THE THIRD

9  PARTY'S OPINION ABOUT THE APPLICATION OF A CONTRACT IS NOT

10  NECESSARILY RELEVANT.  THE -- THE THIRD PARTY IS CLAIMING THAT

11  HE WILL OR SHE WILL DENY THAT HE OR SHE WAS EVER REFERRED IN

12  THE FIRST PLACE.  THAT IS A FACTUAL ISSUE AS OPPOSED TO A

13  LEGAL CONCLUSION.

14    I'M TRYING TO UNDERSTAND WHICH IT IS.

15        **MS. SANDERSON:**  IT'S A FACTUAL ISSUE, YOUR HONOR.

16  AND JUST TO -- THIS IS ABOUT OUR PREDICATE ACT FOR WITNESS

17  TAMPERING.  AND SO ULTIMATELY, THE EFFECT OF THE TESTIMONY IS

18  IRRELEVANT TO WHETHER WE HAVE STATED A CLAIM FOR IT.

19        **THE COURT:**  ALL RIGHT.  ANY RESPONSES ON THIS?

20        **MR. ROTHKEN:**  OKAY.  LET ME JUST SEE IF I CAN

21  UNDERSTAND THIS, YOUR HONOR.

22    PLAINTIFF'S COUNSEL THROUGH A CLIENT SPOKE TO A THIRD

23  PARTY AND WAS LED TO BELIEVE THAT THEY CHANGED THEIR VIEW AND

24  THAT A DECLARATION WAS MADE IN A MANNER THAT WOULD BE

25  TAMPERING SO THAT WOULD THEN CONSTITUTE WITNESS TAMPERING

1    BECAUSE THEY WERE LAVISHED WITH A HOTEL ROOM.

2         IS THAT ESSENTIALLY THAT -- I MEAN, IS THAT YOUR

3    UNDERSTANDING, YOUR HONOR?

4              **THE COURT:**  I DON'T ANSWER QUESTIONS.

5         **MR. ROTHKEN:**  OH, I'M JUST TRYING TO UNDERSTAND WHAT

6    I'M -- ALL RIGHT.

7         ALL RIGHT.  LET ME TELL YOU WHAT I UNDERSTAND.

8              **THE COURT:**  DO YOU HAVE A DECLARATION?

9         **MR. ROTHKEN:**  ME?  NO.

10             **THE COURT:**  WHO HAS THE DECLARATION?

11        **MR. ROTHKEN:**  OH.  OH, NO, YOUR HONOR.  LET ME -- LET

12   ME EXPLAIN, YOUR HONOR.

13        I HAD EITHER AN INVESTIGATOR OR AN ASSOCIATE FROM MY LAW

14   FIRM WHEN WE GOT THIS CASE IN CONTACT WHAT WE UNDERSTOOD TO BE

15   THREE SOURCES OF REFERRALS WHO THEY WERE CLAIMING THAT THEY

16   HAD GOT THAT THEY'RE ENTITLED TO GET COMMISSION ON.

17        THOSE THREE SOURCES OF REFERRALS ARE A CONTRACTUAL PRIVITY

18   WITH MY CLIENT.  THEY HAVE AGREEMENTS WITH THEM THE SPECIFICS

19   I DON'T RECALL, BUT THEY'RE, LIKE, MARKETING AGREEMENTS

20   BECAUSE THEY'RE SENDING TRAFFIC TO MY CLIENT.  PRESUMABLY THEY

21   HAVE THINGS LIKE INDEMNITIES AND THINGS OF THAT NATURE.

22        I -- WE WERE PREPARING FOR A MEDIATION.  AND THE FOLKS

23   FROM MY OFFICE WENT AND CONTACTED THEM TO GET THEIR VIEWS ON

24   WHETHER OR NOT THERE WAS A PREEXISTING RELATIONSHIP WITH MY

25   CLIENTS SO WE COULD PREPARE FOR THE MEDIATION 'CAUSE

1   PRESUMABLY IF THERE WAS, THAT WOULD BE EVIDENCE THAT THERE

2   OUGHT NOT BE REFERRAL COMMISSIONS.

3        MY UNDERSTANDING OF THE DECLARATIONS THAT WE GOT IN

4   PREPARATION FOR OUR JAMS MEDIATION WAS IT WAS BASED UPON

5   FACTUAL INFORMATION THAT MY CLIENT HAD -- AND THAT THEY HAD IN

6   THEIR OFFICES AS TO WHETHER OR NOT THERE WAS A HISTORIC LEGACY

7   RELATIONSHIP AND WHETHER OR NOT THERE WERE HISTORICAL PAYMENTS

8   AND WHETHER OR NOT THERE WAS HISTORICAL TRAFFIC.  AND I DO

9   BELIEVE THAT WE PRESENTED THAT AT THE MEDIATION.

10       I WASN'T THERE.  AN ASSOCIATE FROM MY OFFICE WAS THERE.

11  AND IN TERMS OF THIS THING REGARDING LAVISHING AND ALL THAT,

12  THIS WAS DONE WHOLLY SEPARATE OR INDEPENDENT -- I HAVE NO IDEA

13  WHERE ON ANY TIME LINE THESE THINGS OCCURRED THAT THEY ARE

14  PUSHING TOGETHER.

15       I KNOW THAT WE GOT THE CASE IN, WE KNEW ABOUT THE

16  CONTRACTUAL PRIVITY, AND THEN WE ACTED DILIGENTLY TO GET THE

17  INFORMATION THAT WE NEEDED SO THAT WE COULD UNDERSTAND IF

18  THERE WAS A PREEXISTING RELATIONSHIP.

19       FRANKLY, ANYTHING ELSE BESIDES DETERMINING WHETHER THERE

20  WAS A PREEXISTING RELATIONSHIP PROBABLY WOULDN'T BE RELEVANT.

21  SO TO THE EXTENT THAT THESE THINGS ARE IN THERE, WHICH I DON'T

22  THINK THEY ARE -- I DON'T THINK THAT SOMEONE FROM MY OFFICE

23  WOULD GET OPINIONS -- IT WOULDN'T BE RELEVANT.

24       AND THERE CERTAINLY WAS NO TAMPERING BECAUSE THE FOLKS

25  FROM MY OFFICE ACTED WHOLLY INDEPENDENT OF ANY KNOWLEDGE OF

1   ANYTHING THAT WAS GOING ON IN CONFERENCES.  SO THAT'S --

2   THAT'S THE MOST HONEST WAY THAT I COULD ARTICULATE IT.  SO THE

3   WHOLE THING TO US SOUNDS CONCOCTED.

4       I DO BELIEVE THAT WE ONLY REALLY GOT ONE DECLARATION

5   AND -- AND WE'LL GO BACK AND TAKE A LOOK AT IT.

6           **MS. SANDERSON:**  YOUR HONOR, CAN I MAKE ONE POINT,

7   WHICH IS THAT I DO WANT TO BE CLEAR THAT ALLEGATIONS IN THIS

8   COMPLAINT ARE AS TO DEFENDANTS AND WE HAVE NEVER MADE ANY

9   ALLEGATION OF IMPROPER CONDUCT OF COUNSEL.  I JUST WANT TO BE

10  ON THE LEVEL ABOUT THAT.

11          **THE COURT:**  SO ARE WE TALKING ABOUT TWO SEPARATE ACTS

12  HERE OR THE SAME ACT, BECAUSE YOU REFERENCED AN INDICATION OF

13  INFORMATION COMING FROM COUNSEL.  COUNSEL HAS JUST ADVISED THE

14  COURT THAT THE ONLY INFORMATION THEY HAVE IS THEIR INDEPENDENT

15  INVESTIGATION.

16          **MS. SANDERSON:**  AND A -- A DECLARATION.  IT'S THE

17  TESTIMONY THAT SERVES AS THE BASIS FOR THIS.  AND WHAT I AM

18  CLARIFYING IS THAT WE ARE ARGUING THAT THE -- OR ALLEGING THAT

19  THE DEFENDANTS ARE THE ONES WHO LAVISHED THE GIFTS AND

20  OBTAINED THAT TESTIMONY THROUGH IMPROPER MEANS.  AND I JUST

21  WANT TO BE CLEAR FOR THE RECORD WE HAVE NOT MADE ANY

22  ALLEGATION AS TO COUNSEL THAT WAY.

23          **THE COURT:**  DO YOU HAVE ANY INFORMATION AS TO WHO --

24  WHICH SPECIFIC DEFENDANT APPARENTLY OR ALLEGEDLY OBTAINED THE

25  DECLARATION, IF IT'S NOT THE LAWYERS?

1       **MS. SANDERSON:** IT'S NOT THE OBTAINING OF THE

2  DECLARATION.  IT'S THE INFLUENCE AND SOLICITING OF THE

3  TESTIMONY THAT COULD THEN BE LATER RECORDED IN THE

4  DECLARATION.

5       AT THIS POINT, WE'RE INFORMED AND BELIEVE THAT ARDESHIR

6  AKHAVAN WAS INVOLVED.  BUT, AGAIN, BECAUSE WE BELIEVE THAT

7  DEFENDANTS ACT IN CONCERT WITH ONE ANOTHER ON THESE THINGS,

8  THIS IS ONE OF THE ISSUES THAT WE NEED TO INVESTIGATE THROUGH

9  DISCOVERY.  ON THIS MOTION TO DISMISS, THOUGH, WE BELIEVE THAT

10  WE HAVE STATED AND WITH GOOD RULE 11 BASIS A CLAIM FOR THIS

11  PREDICATE ACT.

12       **THE COURT:** YOU WANT TO ADDRESS THE FACT OF HOW YOU

13  CAN STATE A LANHAM ACT CASE GIVEN THE FACTUAL CIRCUMSTANCES

14  THAT HAVE BEEN ALLEGED?

15       **MS. SANDERSON:** YES.  THE LANHAM ACT CASE IS BASED ON

16  THE -- THE CLAIM IS BASED ON THE SUPREME COURT'S RECENT

17  HOLDING IN THE *LEXMARK* V. *STATIC CONTROL*.

18       **THE COURT:** I NEED FACTS.  I UNDERSTAND THE LAW, AND

19  I KNOW THE LAW.

20       **MS. SANDERSON:** COUNSEL HAS REPRESENTED THAT THIS

21  CANNOT BE A PROPER LANHAM ACT CLAIM BECAUSE IT DOESN'T INVOLVE

22  REPRESENTATIONS MADE TO THE CONSUMING PUBLIC.  HERE, THERE ARE

23  REPRESENTATIONS MADE TO PLAINTIFF'S CLIENTS, THE PEOPLE THAT

24  HE NEEDS TO REFER IN ORDER TO MAKE MONEY FOR HIS BUSINESS.

25       AND SO OUR ARGUMENT IS THAT THEY ARE CONSUMERS UNDER THE

1    LANHAM ACT FOR PURPOSES OF HIS BUSINESS.  AND, THEREFORE, IT'S

2    A PROPER LANHAM ACT CLAIM, TO ADDRESS COUNSEL'S ARGUMENTS

3    SPECIFICALLY.

4            **THE COURT:**  ANYTHING ELSE?

5            **MS. SANDERSON:**  NO, YOUR HONOR.

6            **THE COURT:**  YOU HAVE THROWN ALL OF THESE DEFENDANTS

7    IN TOGETHER.  THERE HAS BEEN NO REAL ARTICULATION OF WHAT ANY

8    PARTICULAR DEFENDANT HAS DONE OR IS DOING.

9        DO YOU HAVE ANY OTHER FACTS OTHER THAN TO THROW THEM ALL

10   IN TOGETHER?

11           **MS. SANDERSON:**  YOUR HONOR, WE HAVE TRIED TO -- WE'RE

12   AWARE OF NUMEROUS OTHER CORPORATIONS THAT ARE RELATED TO

13   DEFENDANTS.

14           **THE COURT:**  WHAT IS THE THEORY -- IS YOUR THEORY?

15   WHAT IS THE THEORY OF DEALING WITH ALL OF THESE VARIOUS

16   INDEPENDENT ENTITIES?

17           **MS. SANDERSON:**  EACH OF THESE ENTITIES IS TIED

18   DIRECTLY TO THE CONDUCT RELATED TO PLAINTIFF.

19           **THE COURT:**  WHAT IS THE LEGAL THEORY UPON WHICH YOU

20   ARE ABLE TO, FROM A LEGAL PERSPECTIVE, HAVE THE ACTS OF ONE

21   IMPUTED TO THE OTHER?

22           **MS. SANDERSON:**  THE ASSOCIATION-IN-FACT ENTERPRISE

23   FOR PURPOSES OF THE RICO CLAIMS.  FOR THE OTHERS, UNDER AN

24   AGENCY OR ALTER EGO THEORY.

25           **THE COURT:**  BUT YOU HAVEN'T ALLEGED CERTAINLY ALTER

1   EGO.  YOU HAVEN'T ALLEGED FACTS TO SUPPORT ALTER EGO.

2           **MS. SANDERSON:**  I WILL IT ADMIT, YOUR HONOR, THAT THE

3   COMPLAINT DOES NOT SPECIFICALLY GO THROUGH THE ALTER EGO

4   ALLEGATIONS.  HOWEVER, WE FEEL THE ALLEGATIONS SUPPORTING THE

5   ASSOCIATION-IN-FACT ENTERPRISE SHOW THAT THESE PEOPLE AND

6   COMPANIES ARE ACTING INTERCHANGEABLY AND AS ONE.

7           **THE COURT:**  SO WHAT IS HARKLET ENTERPRISE ITSELF

8   DOING?

9           **MS. SANDERSON:**  ALL IT DOES IS A HOLD A WEBSITE THAT

10  FEEDS BACK INTO THIS CONDUCT, AND IT'S SPECIFIC HERE BECAUSE

11  DEFENDANT WAS REQUIRED TO GO AND -- OR PLAINTIFF WAS REQUIRED

12  TO GO AND REGISTER ON THAT WEBSITE AS PART OF HIS PERFORMANCE

13  UNDER THE CONTRACT.

14      AND, AGAIN, HE LOOKS AT ONE WEBSITE -- WE'VE HEARD THIS

15  ADMITTED HERE TODAY.  ONE WEBSITE, IT'S HARKLET.  ANOTHER ONE,

16  IT'S NAUTELL.  ANOTHER ONE, WE DON'T EVEN KNOW THE CORPORATE

17  NAME OF IT.

18      THE --

19          **THE COURT:**  LOOK, YOU SHOULD UNDERSTAND THIS MUCH

20  BETTER THAN I DO.  I'M ASKING YOU THE QUESTIONS AS THE

21  PLAINTIFF.  SO THE POINT WITH RESPECT TO HARKLET, AS I'M

22  UNDERSTANDING, IS THAT IT WAS PASSIVE BUT IT WAS REQUIRED THAT

23  THE PLAINTIFF USE THAT WEBSITE TO REGISTER.

24      IS THAT WHAT YOU'RE SAYING?

25          **MS. SANDERSON:**  YES.  BUT OUR ARGUMENT IS NOT THAT

1　HARKLET IS PASSIVE.  IT'S THAT IT'S PART -- PART -- IT'S NOT

2　THE ENTERPRISE.  WE'RE DOING AN ASSOCIATION-IN-FACT ENTERPRISE

3　THEORY, NOT THE CORPORATE ENTERPRISE THEORY.  AND SO HARKLET'S

4　PURPOSE IS TO MAKE SURE THAT PEOPLE WHO GO TO THIS WEBSITE

5　DON'T KNOW ABOUT THE OTHER WEBSITES TO MAKE SURE THAT THIS

6　MONEY GOES THIS WAY AND NOT THIS WAY.

7　　　AND HARKLET IS A -- A CYPRESS CORPORATION, WHICH IS FINE.

8　YOU CAN REGISTER CORPORATIONS IN CYPRESS, BUT IT HELPS TO

9　CONFUSE THE FACT AS TO DO THEY HAVE A CENTRAL LOCATION, ARE

10　THEY OPERATING CENTRALLY?  AND IT IS, THEREFORE, AN ACTIVE

11　PARTICIPANT IN THE FRAUD THAT WAS COMMITTED UPON PLAINTIFF AND

12　IS BEING COMMITTED UPON OTHERS.

13　　　　　**THE COURT:**  ALL RIGHT.  WHAT ABOUT NUNATON?

14　　　　　**MS. SANDERSON:**  SAME, A WEBSITE THAT PLAINTIFF WAS

15　REQUIRED TO REGISTER ON.

16　　　　　**THE COURT:**  INTERNET LIVE?

17　　　　　**MS. SANDERSON:**  INTERNET LIVE, INTERNET BRAND, AND

18　INTERNET BUSINESS SERVICES ARE HOLDING COMPANIES.  WE BELIEVE

19　THAT THEY ALSO -- ONE OF THEM PAYS THE BILLS ON THE OFFICE,

20　OUT OF WHICH ALL OF THESE BUSINESSES ARE OPERATED IN

21　CALABASAS, CALIFORNIA.

22　　　　　**THE COURT:**  WHAT'S THE DIFFERENCE BETWEEN THEM, IF

23　ANY, IN TERMS OF THEIR ACTIONS?

24　　　　　**MS. SANDERSON:**  WE THINK THAT THEY'RE RUN AS ONE IN

25　THE SAME.  AND, AGAIN, YOUR HONOR, I -- I CAN'T GO INTO THE

1    DETAILS OF MS. LUHAR, BUT WE'RE NOT HERE TO HAVE DEFENDANTS

2    THAT DON'T BELONG.  WE HAVE ALLEGED IT BASED ON THE FACTS THAT

3    ARE AVAILABLE TO US THROUGH OUR INVESTIGATION.  IT WASN'T

4    JUST, YOU KNOW, THROWING DARTS AT A BOARD.

5        THERE ARE NUMEROUS COMPANIES THAT ARE RELATED TO

6    DEFENDANTS.  WE HAVEN'T INCLUDED THEM.  THEY DON'T HAVE A

7    DIRECT TIE TO PLAINTIFF.  AND IF DISCOVERY SHOWS THAT OTHERS

8    DO NOT BELONG IN HERE, WE WILL GET RID OF THEM, BUT WE'VE

9    MADE --

10            **THE COURT:**  SO WHAT WAS THE PLAINTIFF'S, THEN,

11   INTERACTION WITH INTERNET LIVE?

12            **MS. SANDERSON:**  PLAINTIFF WAS REQUIRED TO GO TO AN

13   IN-PERSON MEETING AT THE OFFICE IN CALABASAS THAT WE BELIEVE

14   BASED ON JOB LISTINGS, BASED ON EVERYTHING, IS KIND OF A

15   HOLDING COMPANY FOR THESE OTHER BUSINESSES.

16       BUT UNTIL WE GET INTO DISCOVERY, WE CANNOT GIVE FURTHER

17   DETAIL IN THAT.  WE HAVE ENOUGH INFORMATION, THOUGH, TO MEET

18   OUR PLEADING REQUIREMENTS.

19            **THE COURT:**  WHAT IS THE CONNECTION OF THE PLAINTIFF

20   TO INTERNET BRAND?

21            **MS. SANDERSON:**  AGAIN, WE BELIEVE THAT INTERNET LIVE

22   AND INTERNET BRAND ARE RUN SIMULTANEOUSLY.

23            **THE COURT:**  SO THERE'S NO SPECIFIC -- SO -- YOU'VE

24   ARTICULATED SOMETHING WITH RESPECT TO INTERNET LIVE, BUT YOU

25   DON'T HAVE ANYTHING ELSE TO ARTICULATE WITH RESPECT TO

1  INTERNET BRAND.  YOU'RE JUST BRINGING IT IN BECAUSE YOU THINK

2  INTERNET LIVE RUNS IT?

3      **MS. SANDERSON:**  BASED ON OUR INVESTIGATION, BOTH

4  INTERNET BRAND AND INTERNET LIVE ARE RUNNING THE SHOW AND --

5  IT SEEMS TO BE JUST -- FROM MY PERSPECTIVE, I DON'T KNOW, I

6  HAVE NOT DONE DISCOVERY -- BUT LOOKING AT THE INFORMATION

7  THAT'S PUBLICLY AVAILABLE, IT SEEMS TO BE A GUESS AS TO WHICH

8  ONE -- WHICH ENTITY DEFENDANTS USE TO DO THIS OR TO DO THAT,

9  TO POST JOB LISTINGS, TO LIST THEMSELVES IN THIS DIRECTORY.

10    THERE DOESN'T SEEM TO BE ANY RHYME OR REASON OTHER THAN

11  THAT THEY'RE BOTH INVOLVED.

12      **THE COURT:**  AND PLAINTIFF WAS REQUIRED TO GO THERE BY

13  WHOM?

14      **MS. SANDERSON:**  MR. AKHAVAN ASKED HIM TO MEET THEM

15  THERE.

16      **THE COURT:**  AT THE OFFICES OF INTERNET LIVE OR

17  INTERNET BRAND?

18      **MS. SANDERSON:**  WELL, HE SAID THEY WERE THE OFFICES

19  OF CECASH.  THIS BRINGS US BACK TO THE PROBLEM.

20      **THE COURT:**  SO HOW DID YOU BECOME AWARE OF INTERNET

21  LIVE AND INTERNET BRAND?

22      **MS. SANDERSON:**  WE WERE AWARE OF THEM THROUGH JUST

23  GOOD OLD-FASHIONED INTERNET RESEARCH AND INVESTIGATION, BUT

24  THEN WITH THEIR FIRST MOTION TO -- OR MOTION TO SQUASH SERVICE

25  OF THE COMPLAINT, MR. MIZRACHI -- AND I HOPE I'M PRONOUNCING

1   THAT RIGHT -- FILED A DECLARATION THAT ESSENTIALLY CONFIRMED

2   THAT THOSE WERE THE BUSINESSES DOING BUSINESS AT THAT

3   LOCATION.

4         **THE COURT:**  AND INTERNET BUSINESS SERVICES?

5         **MS. SANDERSON:**  YES.  SAME THING, ALTHOUGH

6   PLAINTIFF -- OR DEFENDANTS' COUNSEL HAS REPRESENTED TO US THAT

7   AT THIS POINT, THAT HAVE MIGHT BE A DBA.

8     THERE IS A CORPORATE HISTORY WITH THE STATE OF CALIFORNIA,

9   AND THEY HAVE APPEARED SEPARATELY IN THE CASE.

10         **THE COURT:**  WHAT IS THE PLAINTIFF'S INTERACTION WITH

11   NAUTELL CAPITAL?

12         **MS. SANDERSON:**  AGAIN, THE HOLDER OF A WEBSITE.

13         **THE COURT:**  WHAT IS THE WEBSITE?

14         **MS. SANDERSON:**  IT IS CITYSEX.COM.

15         **THE COURT:**  I THOUGHT -- OKAY.  MAYBE I'M SAYING THEM

16   WRONG.  I THOUGHT NUNATON COMPANY WAS CITYSEX?

17         **MS. SANDERSON:**  NUNATON IS CASHTRAFFIC.COM.

18         **THE COURT:**  DID THE PLAINTIFF REGISTER THERE AS WELL?

19         **MS. SANDERSON:**  YES.

20         **THE COURT:**  AND -- AND WHAT DOES IT MEAN FOR THE

21   PLAINTIFF TO REGISTER?

22         **MS. SANDERSON:**  THESE WEBSITES ARE AFFILIATE

23   WEBSITES.  THEY ASK AFFILIATE ADVERTISERS TO GO AND REGISTER

24   ON THE WEBSITE TO START PROMOTING THE WEBSITE.  AND I

25   BELIEVE -- I HAVE NOT REGISTERED MYSELF -- THAT IT THEN GIVES

1    THEM ACCESS TO CERTAIN TRACKING PLATFORMS.

2        PLAINTIFF WAS NOT ACTING AS AN AFFILIATE.  HE WAS JUST A

3    BROKER BUT WAS ASKED TO GO REGISTER ON THESE WEBSITES SO HE

4    COULD HAVE ACCESS TO THE TRACKING PLATFORMS OR SPREADSHEETS,

5    DATABASE, HOWEVER YOU WANT TO LOOK AT IT.

6        THAT WOULD LET HIM MONITOR THE TRAFFIC THAT HIS REFERRALS

7    WERE SENDING OVER TO DEFENDANTS.  IT'S -- IT'S AN AUDITING

8    CONTROL IN A WAY.

9            **THE COURT:**  CASH TRAFFIC LIMITED, WHICH MAY BE

10   DEFUNCT, WHAT'S HIS INTERACTION WITH THAT COMPANY?

11           **MS. SANDERSON:**  I BELIEVE THAT CASH TRAFFIC WEBSITE,

12   CASHTRAFFIC.COM, THE TERMS LIST NUNATON AS THE OWNER, BUT

13   OTHER INDICATIONS ON THE WEBSITE INDICATE IT'S OWNED AND

14   OPERATED BY AN ENTITY CALLED CASH TRAFFIC LTE.

15           **THE COURT:**  ALACRE TRADING?

16           **MS. SANDERSON:**  THAT IS THE IBALLERS WEBSITE.

17           **THE COURT:**  YOU SAID "IBALLERS" AS IN --

18           **MS. SANDERSON:**  YES, "I" AS IN, LIKE, IPOD.

19   IBALLERS.

20           **THE COURT:**  AND HE REGISTERED THERE AS WELL?

21           **MS. SANDERSON:**  YES.

22           **THE COURT:**  AND IN EACH OF THE PLACES WHERE HE

23   REGISTERED, IS THAT WHERE THE TERMS AND CONDITIONS OF THE

24   ALLEGED AGREEMENTS OCCURRED?

25           **MS. SANDERSON:**  CORRECT, ALLEGEDLY.

1        **THE COURT:**  ARE THEY ALL THE SAME?

2        **MS. SANDERSON:**  NO.  AND THAT'S -- THAT'S PART OF --

3    THAT'S PART OF OUR -- OUR ISSUE ON THE ARBITRATION ISSUE IS

4    THAT THESE AGREEMENTS ARE ONLY ONE DEFENDANT AT A TIME AND

5    THEY ACTUALLY CONFLICT WITH EACH OTHER IN MANY RESPECTS.

6        **THE COURT:**  AND WITH RESPECT TO THE BREACH OF

7    CONTRACT, THEN, IT SOUNDS LIKE YOU HAVE MULTIPLE CAUSES OF

8    ACTIONS BECAUSE THERE ARE MULTIPLE CONTRACTS AND DIFFERENT

9    AMOUNTS DUE UNDER EACH OF THESE VARIOUS REGISTRATION SITES?

10        **MS. SANDERSON:**  THAT'S -- THAT'S INCORRECT FROM

11    PLAINTIFF'S PERSPECTIVE.

12        WE'RE ALLEGING BREACH OF A SINGLE CONTRACT WHICH WAS THE

13    REFERRAL CONTRACT, THE CONTRACT FOR HIM TO MAKE REFERRALS OF

14    AFFILIATES.  PLAINTIFF ONLY REGISTERED ON THESE WEBSITES IN

15    ORDER TO GAIN ACCESS TO THE TRACKING PLATFORMS.  IT WAS THE --

16    A TECHNICAL REQUIREMENT, IF YOU WILL, AND HE NEVER SENT -- THE

17    TERMS ARE INAPPLICABLE TO HIM AND HIS RELATIONSHIP TO THE

18    DEFENDANTS.

19        **THE COURT:**  AND VERDE MEDIA CORPORATION, IS IT --

20    WHAT KIND OF CORPORATION IS IT?  HAS -- IS IT A PUBLIC

21    CORPORATION?  A --

22        **MS. SANDERSON:**  NO.

23        **THE COURT:**  I DIDN'T THINK SO.  SO WHAT KIND OF

24    CORPORATION IS IT?

25        **MS. SANDERSON:**  IT'S A -- A NEVADA LIMITED LIABILITY

1  COMPANY.

2       **THE COURT:** SOLE PROPRIETOR? WHOLLY OWNED?

3       **MS. SANDERSON:** WHOLLY OWNED.

4       **THE COURT:** BY HOW MANY PEOPLE?

5       **MS. SANDERSON:** ONE.

6       **THE COURT:** WHAT'S THAT PERSON'S NAME.

7       **MS. SANDERSON:** JEREMY GREEN AND IT'S REFERENCED IN

8  THE COMPLAINT.

9               (PAUSE IN THE PROCEEDINGS.)

10      **THE COURT:** ALL RIGHT. WELL, I THINK I HAVE A BETTER

11 UNDERSTANDING.

12    ANYTHING ELSE YOU WANT TO SAY AT THIS JUNCTURE WHILE I

13 CHECK MY NOTES?

14      **MS. SANDERSON:** NO, YOUR HONOR.

15      **THE COURT:** MR. ROTHKEN?

16      **MR. ROTHKEN:** THANK YOU.

17    QUICKLY, YOUR HONOR, WE BELIEVE THIS IS A GARDEN-VARIETY

18 CONTRACT DISPUTE AT BEST, THAT THE PARTIES WHO COULD

19 POTENTIALLY BE INVOLVED ARE NOT EVEN HERE, THAT THE AFFILIATE

20 PROGRAM BOILER PLATE TERMS OF USE ONLINE WOULD BE APPLICABLE

21 IN SOME REGARD. DOESN'T JUST APPLY -- IT APPLIES TO EVERY

22 SPECIES OF FOLKS WHO REGISTER AND ARE INVOLVED IN SENDING

23 TRAFFIC. IT'S NOT LIMITED TO ANY ONE PARTICULAR TYPE OF

24 AFFILIATE. AND WHEN YOU SIGN UP AND REGISTER FOR AN AFFILIATE

25 PROGRAM ON LINE, AS AN OFFER OF PROOF, YOU GET A CODE. AND

1  THAT CODE IS TIED TO HOW MUCH YOU GET, AND IT'S AN ENTIRE

2  PROCESS.

3      AND THOSE ALL CONTAIN ARBITRATION CLAUSES, AND I'LL REMIND

4  THE COURT THAT NUMEROUS TIMES DURING THIS PROCESS, WE OFFERED

5  TO ENTER INTO A STIPULATION TO CONSOLIDATE THIS INTO AN

6  ARBITRATION, THAT WE WEREN'T GOING TO HAVE A SCENARIO WHERE

7  SOMEONE HAD TO GO TO CYPRESS OR EVEN LA.  WE OFFERED, I THINK,

8  SAN FRANCISCO JAMS.

9      AND WE BELIEVE THAT -- FRANKLY, THAT THESE RICO CLAIMS ARE

10 CONCOCTED TO GET FEDERAL JURISDICTION WHERE NONE SHOULD SIT,

11 AND --

12      **THE COURT:**  WELL, ON THAT -- I MEAN, LET'S SAY I --

13 ISN'T THERE DIVERSITY JURISDICTION HERE?

14      **MS. SANDERSON:**  NO, YOUR HONOR.

15      **THE COURT:**  IT'S A NEVADA -- THERE'S NOT?

16      **MS. SANDERSON:**  I DON'T BELIEVE THAT THERE IS.

17 BECAUSE THE -- THE PLAINTIFF NEVADA CORPORATION AT ONE POINT

18 DURING THE EVENTS AT HAND WAS A CALIFORNIA CORPORATION.

19      **MR. ROTHKEN:**  THEY -- THEY FOLDED THEIR -- THEIR

20 CORPORATION.  CHANGED IT OVER THE YEARS SINCE THE RELATION

21 STARTED, SO IRONICALLY THE PLAINTIFF IS A NEW ENTITY.

22      **THE COURT:**  I WAS WONDERING THAT BECAUSE AS I READ

23 THROUGH IT, I HAD A NEVADA CORPORATION ON ONE SIDE.  EVERYBODY

24 ELSE ON THE OTHER SIDE WAS A CALIFORNIA CORPORATION.  AND SO I

25 THOUGHT, WELL, WOULDN'T I HAVE JURISDICTION ANYWAY?  SO THAT

1   ANSWERS MY QUESTION.

2       ALL RIGHT.  ANYTHING ELSE?

3           **MR. ROTHKEN:**  THANK YOU, YOUR HONOR.

4           **MS. SANDERSON:**  NO, THANK YOU.

5           **THE COURT:**  ALL RIGHT.  SUBMITTED?

6           **MR. ROTHKEN:**  SUBMITTED, YOUR HONOR.  THANK YOU.

7           **THE COURT:**  THANK YOU.

8               (PROCEEDINGS WERE CONCLUDED AT 3:12 P.M.)

9                       --OOO--

10

11                  **CERTIFICATE OF REPORTER**

12

13          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

14   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15   I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,

16   NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS

17   HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR

18   OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

19

20      _____

21      RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

22              TUESDAY, MARCH 3, 2015

23

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**